**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| MARCELLA JOHNSON | : | Civil No.: 16-8422 |
| | : | |
| -and- | : | |
| | : | |
| BETTY DAVIS a/k/a BETTY BEVERLY | : | CAMDEN VICINAGE |
| | : | |
| -and- | : | |
| | : | |
| GLENNA NICHOLS | : | |
| | : | |
| -and- | : | |
| | : | |
| SWARDELLA CLARK, | : | |
| | : | |
| Plaintiffs, | : | |
| *v.* | : | |
| | : | |
| GLOUCESTER COUNTY | : | |
| IMPROVEMENT AUTHORITY | : | |
| | : | |
| -and- | : | |
| | : | |
| SHADY LANE NURSING HOME | : | |
| | : | |
| -and- | : | |
| | : | |
| CARMEN TREFFILETTI | : | |
| | : | |
| -and- | : | |
| | : | |
| SHERRY FAULKNER | : | |
| | : | |
| -and- | : | |
| | : | |
| MICHELLE BAYLOR | : | |
| | : | |
| -and- | : | |
| | : | |
| GEORGE STRACHAN | : | |
| | : | |
| -and- | : | |
| | : | |
| SAL ROCABALDI | : | |

1

|  | : |
|---|---|
| -and- | : |
|  | : |
| JOE D'ANGELO | : |
|  | : |
| -and- | : |
|  | : |
| ANTHONY PEPE | : |
|  | : |
| -and- | : |
|  | : |
| MEGAN KERR | : |
|  | : |
| -and | : |
|  | : |
| BETH HIGGINS, | : |
|  | : |
| Defendants. | : |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, Marcella Johnson, Betty Davis a/k/a Betty Beverly, Glenna Nichols, and Swardella Clark, by and through their undersigned counsel, the O'Hanlon Law Firm, P.C., hereby demand a trial by jury and complain in the present second amended form pursuant to Federal Rule of Civil Procedure 15(a)(1) (A) and (B) and pursuant to this Court's Order against the above-captioned Defendants, the individual Defendants in their individual capacities acting under color of state law and the employer directly and acting pursuant to Constitutional-violating customs and policies as follows:

## PRELIMINARY STATEMENT

1.      This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1981 through 42 U.S.C. § 1983 where applicable, and 42 U.S.C. § 1988, the 42 U.S.C. § 1983 claims for violations of Plaintiffs' Fourteenth Amendment Equal Protection Clause rights by the individually-named Defendants acting under color of state law.  Plaintiffs are seeking damages to redress the deprivation of their rights from discriminatory employment practices on the basis of

race, by Defendants, Gloucester County Improvement Authority and Shady Lane Nursing Home, through their practices and customs, and resulting in a deprivation of benefits, privileges, terms, and conditions of employment owed to Plaintiffs by Defendants, Gloucester County Improvement Authority and Shady Lane Nursing Home, which are enjoyed by Caucasian employees but that were denied to African-American Plaintiffs.  Associated state law claims are brought pursuant to the New Jersey Law Against Discrimination ("LAD"), NJSA 10:5-1 as relating to race-based discrimination, hostile work environment, and retaliation.

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1343, to redress the unlawful deprivation of Plaintiffs' rights secured, guaranteed, and protected by federal law.  Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b), wherein Plaintiffs reside, Defendants regularly conduct business and/or reside, and where all the wrongful conduct occurred.  Pendent or supplementary jurisdiction allows this Court to consider Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

3.     Plaintiff Marcella (Marcie) Johnson (hereinafter "Plaintiff Johnson") is an adult female citizen of the United States and New Jersey and resides at 421 West Broad Street, Paulsboro, NJ 08066.

4.     Plaintiff Betty Davis a/k/a Betty Beverly (hereinafter "Plaintiff Davis") is an adult female citizen of the United States and New Jersey and resides at 235 West Washington Street, Paulsboro, NJ 08066.

5.     Plaintiff Glenna Nichols (hereinafter "Plaintiff Nichols") is an adult female

citizen of the United States and New Jersey and resides at 125 Thomson Avenue, Paulsboro, NJ 08066.

6.      Plaintiff Swardella Clark (hereinafter "Plaintiff Clark") is an adult female citizen of the United States and New Jersey and resides at 17 Belmont Court, Sicklerville, NJ 08081.

7.      Defendant Gloucester County Improvement Authority (hereinafter "Defendant GCIA") is responsible for providing various waste, recycling, child development, nursing home, and other care and recreational activities for Gloucester County, New Jersey.  Defendant GCIA is located at 109 Budd Boulevard, Woodbury, NJ 08096.

8.      Defendant Shady Lane Nursing Home is wholly operated by Gloucester County and Defendant GCIA and is located at 256 County House Road, Clarksboro, NJ 08020.  All Plaintiffs and all individually-named Defendants, with the exception of Defendant Trefiletti, work or worked at this location.

9.      Defendant Carmen Treffiletti (hereinafter "Defendant Treffiletti") is or was Human Resources ("HR") and Equal Employment Opportunity ("EEO") Director is a present or former supervisor and employee at Defendant GCIA located at 109 Budd Boulevard, Woodbury, NJ 08096.

10.      Defendant Sherry Faulkner (hereinafter "Defendant Faulkner") is or was Director of Nursing and is a present or former supervisor and employee at Shady Lane Nursing Home located at 256 County House Road, Clarksboro, NJ 08020.

11.      Defendant Michelle Baylor (hereinafter "Defendant Baylor") is an Administrator and is a present or former supervisor and employee at Shady Lane Nursing Home located at 256 County House Road, Clarksboro, NJ 08020.

12.      Defendant George Strachan (hereinafter "Defendant Strachan") was an

Administrator and is current acting Director of GCIA and is a present or former supervisor and employee at Shady Lane Nursing Home located at 256 County House Road, Clarksboro, NJ 08020.

13.     Defendant Sal Rocabaldi (hereinafter "Defendant Rocabaldi") is Supervisor of Environmental Services and is a present or former supervisor and employee at Shady Lane Nursing Home located at 256 County House Road, Clarksboro, NJ 08020.

14.     Defendant Joe D'Angelo (hereinafter "Defendant D'Angelo") is Head of Maintenance and Environmental management and is a present or former supervisor and employee at Shady Lane Nursing Home located at 256 County House Road, Clarksboro, NJ 08020.

15.     Defendant Anthony Pepe (hereinafter "Defendant Pepe") is Supervisor of Environmental Services and Food Services and is a present or former supervisor and employee at Shady Lane Nursing Home located at 256 County House Road, Clarksboro, NJ 08020.

16.     Defendant Megan Kerr (hereinafter "Defendant Kerr") was a former HR Director and former supervisor and employee at Shady Lane Nursing Home located at 256 County House Road, Clarksboro, NJ 08020.

17.     Defendant Beth Higgins (hereinafter "Defendant Higgins") was a former Nursing Manager and was a former supervisor and employee at Shady Lane Nursing Home located at 256 County House Road, Clarksboro, NJ 08020.

## FACTS COMMON TO ALL COUNTS

18.     Plaintiff Johnson started working at Defendant Shady Lane on August 4, 1999 initially as an environmental service / housekeeping employee.

19.     Plaintiff Davis began working at Defendant Shady Lane on October 13, 1988 as a

certified nurse's aid.

20.     Plaintiff Nichols began working at Defendant Shady Lane on November 7, 2005 initially as a certified nurse's aid.

21.     Plaintiff Clark began working at Defendant Shady Lane on January 14, 2014 as certified nurse's aid.

22.     In 2011, Plaintiff Johnson complained to the NAACP about Defendant Shady Lane because of all the racist things that were going on at Defendant Shady Lane including differential treatment based upon race in disciplinary contexts perpetuated by among others Defendant Strachan, withholding of Plaintiff Johnson's increased pay by Defendant Strachan despite Plaintiff Johnson being given a purported promotion requiring a union grievance, more exacting scrutiny of licensing upkeep for African-American employees as compared to Caucasian employees, a Caucasian nurse named Vicky Smith calling an African-American certified nurse's assistant Aunt Jemima, and Defendant D'Angelo calling a student worker named Jamal a Nigger.

23.     The president of the Gloucester County NAACP chapter, Loretta Winters, talked to Plaintiff Johnson before Winters visited Defendant Shady Lane and got African-American employees' versions of events and Winters met with Defendant Strachan, an administrator at Defendant Shady Lane and presently the acting director of Defendant GCIA.  Winters also met with Milton Benton head of EEO for Gloucester County, Defendant Strachan (Plaintiff Johnson's supervisor), and Carmen A. Malignaggi, Esquire for Defendant Shady Lane, as well as Plaintiffs Johnson and Davis.

24.     After the meeting and by April 2, 2012, Plaintiff Johnson was laid off in retaliation for this protected EEO activity.  Plaintiff Johnson worked for a time as the receptionist

on the front desk and when Plaintiff Johnson went to be formally laid off by Defendant Baylor, an administrator at Defendant Shady Lane, and Defendant Treffiletti, Plaintiff Johnson was falsely informed that her position was being eliminated.  This was a pretextual and retaliatory termination based upon Plaintiff Johnson's prior EEO complaints and Defendant Baylor falsely stated that Plaintiff Johnson's position was eliminated due to budgetary constraints.

25.     Despite being laid off, Plaintiff Johnson met an individual from the housekeeping department and came back to work in housekeeping (a lower paid position) at Defendant Shady Lane on July 27, 2012.  Plaintiff Johnson was back for two days and had her first write-up ever because Plaintiff Johnson came in at the time that housekeepers are supposed to come in and not the time supervisors told Plaintiff Johnson to come in.  This kind of treatment never happened to similarly-placed Caucasian employees and went against the terms of the Collective Bargaining Agreement ("CBA").

26.     Plaintiff Johnson was continually and pretextually written up for everything that Caucasian supervisors could get Plaintiff Johnson for and Defendant Baylor called it "progressive discipline."  Supervisors, including Defendant Baylor, wanted to terminate Plaintiff Johnson because Plaintiff Johnson used an emergency Administrative Day when Plaintiff Johnson called out sick and supervisors made Plaintiff Johnson get a note from a doctor. Plaintiff Johnson told her supervisors that she did not go to the doctor but Defendant Baylor insisted that Plaintiff Johnson get a doctor's note so Plaintiff Johnson did so.

27.     Plaintiff Johnson was castigated by Defendants Baylor and Treffiletti, despite Plaintiff Johnson and her union representative telling Defendants Baylor and Treffiletti that per the CBA, Plaintiff Johnson was not required to bring a doctor's note.  Defendant Pepe also requested a doctor's note from Plaintiff Johnson.  Defendants Baylor and Treffiletti called the

7

doctor's office to see what kind of doctor he was.  This occurred on September 5, 2013. Plaintiff Johnson was again pretextually terminated on September 27, 2013 for talking to a resident which is part of Plaintiff Johnson's job description. Plaintiff Johnson won an arbitration and got her job back and she returned to work on January 15, 2015 without backpay due to false accusations that were made by Defendants.

28.     Upon return to work in 2013, Plaintiff Johnson was again pretextually punished by Defendants Baylor and D'Angelo and Plaintiff Johnson was labeled as being angry and having a chip on her shoulder by Defendants Treffiletti and Kerr as well as other Defendant supervisors such as Defendant Rocabaldi.  This type of treatment had occurred from previously from July of 2012 until September of 2013 and subsequent retaliatory incidents included Defendant Rocabaldi sending someone to Plaintiff Johnson's grandmother's funeral to see if Plaintiff Johnson was present.  These Defendants would also write up Plaintiff Johnson for no reason in stark contrast to Caucasian employees.

29.     Upon return to work, Defendant Pepe, who also was involved in the decision to terminate, called Plaintiff Johnson to Defendant Pepe's office and asked Plaintiff Johnson how she was rehired.  Defendant Pepe told Plaintiff Johnson that he was instructed to adversely treat Plaintiff Johnson and to pretextually terminate her by Defendants Baylor and Treffiletti.

30.     Plaintiff Johnson continues to suffer disparate and retaliatory treatment based up race since she has been back and no other similarly-placed Caucasian employee is subjected to such excessive supervision and pretextual discipline.

31.     In May of 2016, Defendants GCIA, Shady Lane, Treffiletti, and Strachan brought in an attorney to confront Defendant Johnson about calling a coworker Uncle Tom.  This name calling never occurred and the coworker, John Worthy, denied it ever occurred.

32.     On March 28, 2017, Plaintiff Johnson was called to a meeting by Defendant Pepe purportedly because Plaintiff Johnson had made statements that a certain nurse was only hired because she was Caucasian.  This conversation never happened.

33.     On March 30, 2017, Plaintiff Johnson met with Defendants Pepe and Baylor and these Defendants said that Plaintiff Johnson would be placed on paid leave until a decision was made.

34.     On April 3, 2017, Plaintiff was terminated in a meeting with Defendants Pepe and Baylor.  The justification was that Plaintiff Johnson had taken excessive breaks when Plaintiff Johnson did not take excessive breaks compared to Caucasian employees who can take frequent breaks to smoke or do other things without censure.

35.     Plaintiff Johnson was terminated in retaliation for prior upheld complaints of racial discrimination and because of the present lawsuit before this Court.

36.     Around May 30, 2010, Plaintiff Davis received a telephone call from Defendant Faulkner who is the Director of Nursing at Defendant Shady Lane.  Defendant Faulkner told Plaintiff Davis not to report to work.  Plaintiff Davis asked for the reason and Defendant Faulkner stated that a resident at Defendant Shay Lane said that Plaintiff Davis banged the patient's ankles with a stand-up lift.  Plaintiff Davis knew that that was not true and that it was a Caucasian employee that was in charge of the patient that night.

37.     As a result of these false accusations, Plaintiff Davis suffered adverse discipline and had to fight to retain her job in 2010 because she was falsely accused of injuring a patient. Plaintiff Davis also was reported to the State of New Jersey and had to go to Trenton to plead her case because there was a strong possibility that she could have lost her certification in nursing because of the false accusations in relation to following a care plan.

38.     Between 2011 and 2015, Plaintiff Davis was intimidated by Defendants Faulkner, Baylor, Treffiletti, and Higgins, who attempted to force Plaintiff Davis to retire when Plaintiff Davis injured herself at work.   This was in retaliation for Plaintiff Davis' prior successful arbitration.  Caucasian workers were never adversely treated like this when injured at work.

39.     Plaintiff Davis had a hearing with David Shields of Defendant GCIA at that time. Mr. Shields no longer works at Defendant GCIA or Defendant Shady Lane but Plaintiff Davis did eventually get her job back with back pay on October 13, 2011.

40.     Plaintiff Davis recently slipped and fell on black ice on January 19, 2015. Plaintiff Davis was out on workers' compensation benefits.  When Plaintiff Davis came back to work, Plaintiff Davis had to do a test for duty task of lifting 50 pounds which Plaintiff Davis passed.  Plaintiff Davis was assigned to floor duty.  Plaintiff Davis was told to inform Defendant Faulkner if Plaintiff Davis had any pain and to let Defendant Faulkner know if Plaintiff Davis had pain for two days in a row.  Plaintiff Davis did inform Defendant Faulkner of two days of pain but Defendant Faulkner and other managers did nothing.  On the third day, the pain was so bad that Plaintiff Davis had to get a medical appointment right way.

41.     After that, Plaintiff Davis was again released by her physician to return to work on full duty on July 20, 2015.  Plaintiff Davis was called into the office by Defendant Treffiletti who stated to Plaintiff Davis that she was going to housekeeping temporarily until one of the employees returned from leave.  Defendant Treffiletti also cut Plaintiff Davis' pay by $3 per hour.  This was in contravention of the terms of the CBA which states that if Plaintiff Davis falls under the Disability Act, she can be given an alternative role but cannot be given lower pay. Caucasian workers were never similarly treated and never received effective demotions for being injured at work.

42.     Plaintiff Davis is not even permitted to feed residents because of false accusation and admonishments which affect her certification paperwork.   Similarly placed Caucasian employees are not subjected to false accusations, baseless punishment, strenuous labor, and pay cuts as a result of work-related injuries.

43.     On January 30, 2017 and in direct retaliation for meritorious racial discrimination complaints and the present lawsuit, Plaintiff Davis was disciplined by Defendant Pepe because Plaintiff Davis used the word "the" to Robin Atkinson.  Defendant Pepe said this was a threat and complaints to Defendant Treffiletti regarding racial motivation by Defendant Pepe were ignored.

44.     Punishment/discipline always has been harsher for African-American employees than it is for similarly-placed Caucasians.  If a Caucasian nurse or certified nursing aide did get disciplined, it was a delayed discipline process done only to make it appear that management was not being racist in their discipline of African-American employees.   This has been going on continuously for years.

45.     A few months after Plaintiff Nichols started work in 2005, Defendant Faulkner became Director of Nursing at Defendant Shady Lane.

46.     Defendant Faulkner immediately began writing Plaintiff Nichols up for things like calling out sick even though Plaintiff Nichols would tell Defendant Faulkner "I used my sick time when I called out."  Defendant Faulkner would say "but Glenna [Plaintiff Nichols] you know you weren't sick."

47.     Plaintiff Nichols was conscientious with regard to punctuality but it was difficult sometimes because Plaintiff Nichols was one of those aides who worked upwards of eighty hours per week.  Caucasian aides who came in late and would never do overtime would get their

lateness and call outs excused.  Plaintiff Nichols specifically remembers on one occasion that Defendant Faulkner called about six employees into the office behind the nurses' station and Defendant Faulkner told the employees, including Plaintiff Nichols, that Defendant Faulkner had write ups for all employees for being late.  All of the Caucasians' latenesses were excused but Plaintiff Nichols' was not.

48.     Eventually Plaintiff Nichols was effectively forced to switch to the 3 to 11 shift. In 2007, Plaintiff Nichols began having a problem on the 7 to 3 shift with coworkers and nurses calling her "fat ass" and "get your fat ass down the hall" and "shake your fat ass."  These things were said to Plaintiff Nichols in front of the Defendant Faulkner who also thought it was funny and laughed.

49.     In 2007, Defendant Strachan asked Plaintiff Nichols "is your pastor your menstrual?"  Plaintiff Nichols asked "menstrual what?"  Defendant Strachan said "menstrual cycle" in a joking manner and thought it was funny until Plaintiff Nichols sent an email complaining on September 6, 2007 to David Shields of Defendant GCIA.   Shields sent Defendant Strachan an email back telling him to "handle it."  Plaintiff Nichols was forced to meet with Defendant Strachan alone, the very person that Plaintiff Nichols had complained about.

50.     Eventually, Plaintiff Nichols was trying to work 7-3 but had to stay on 3-11 until Defendant Shady Lane had an open slot on dayshift. Plaintiff Nichols began to see even more discrimination.   Defendant Shady Lane had computers behind the nurses' station.   Christi Esposti, Bethany Britton,  Keri Cowgill,  Debbie Ortiz, and Matt Smith were all Caucasian aides and would be behind the desk and on the PCs all the time but if African-American aides get caught sitting behind the desk it was a big issue and Defendant Faulkner would call Plaintiff

Nichols into the office and threaten Plaintiff Nichols with write ups and have mandatory meetings telling all employees that  no certified nurse's assistants were allowed to sit behind the desk and be on the computers.  But it was never an issue when the Caucasian aides did it.  It was only if African-American aides were reported to Defendant Faulkner that there would be an issue.  This has happened continuously from 2007 until the present.

51.    In 2007, all aides were told that those who worked in the nursing field must abide by state and federal law concerning patient abuse and abuse must be reported.  Plaintiff Nichols saw two Caucasian aides swing and toss a resident in bed.  Plaintiff Nichols reported the incident to Defendant Faulkner but she did nothing to follow up and nothing happened.

52.    At this time and through 2012, Plaintiff Nichols would repeatedly and constantly complain to Defendant Faulkner that Caucasian nurses and aides were allowed to treat residents any kind of way and mishandle and verbally and physically abuse residents and nothing would be done.  For instance, Defendant Shady Lane had a resident named Mrs███████ who went to the hospital for pneumonia.  When Mrs. ███████ returned to Defendant Shady Lane, Vicki Smith told Plaintiff Nichols that she had to give her a shower. Mrs. ███████ refused and Vicki Smith and Michelle Morales took Mrs. ███████ snatched her out of bed put her in the wheelchair and leaned the wheelchair back on two wheels and took her to the tub room kicking and screaming.  She was crying "Why?" . . . "I'm sick" . . . "I don't want to get wet . . . ."  Vicki Smith said "too bad . . . you're in my army now."  Plaintiff Nichols reported this to Defendant Faulkner but nothing was done and it was just covered up.

53.    In 2010 and 2011 a Caucasian employee named Bethany Britton shaved elderly, female patients' pubic areas and state inspectors were called in to Defendant Shady Lane.  In stark contrast to Plaintiffs, Britton did not receive any public discipline.

13

54.     Defendant Faulkner would do a lot of backtracking to cover up any wrong doing on the part of Caucasian aides and nurses, including Bethany Britton, but if a Caucasian patient made an accusation about an African-American aide, Defendant Faulkner would take that accusation and try to make the African-American aides or nurses appear guilty in an attempt to get them fired. The discipline was always harsher and greater for African-American nurses and aides and if they tried to file a grievance, Defendant supervisors would create more lies and follow African-American aides or nurses around the facility trying to find something to report.

55.     Defendant Faulkner was very close to Caucasian nurses and aides and treated them like her favorite friends.  One day while taking a dinner break, Plaintiff Nichols walked behind the nurses' station and saw Matt Smith pushing the linen cart past the nurses' station with someone inside the linen cart screaming while Matt pushed it outside the door in the rain. Plaintiff Nichols looked at Terri Smith and said "who is that in the cart?" Terri said "our Don Sherry."  A few minutes later, the door opened and Sherry came in wet from being rained on pulling the linen cart staff used for patient care.  She said "where's Glenna?  She did not see that did she?"  Plaintiff Nichols came from behind the nurses' station and said she did see. When Plaintiff Nichols reported to Defendant Faulkner that the residents on men's hall had their lights on for assistance and Matt was not in the building, nothing was done. But if a Caucasian nurse reported that someone had their light on too long and Plaintiff Nichols was busy with another resident, Defendant Faulkner would try and make it seem like  Plaintiff Nichols was neglecting residents and Defendant Faulkner would have Plaintiff Nichols do in-services when all Defendant Faulkner would have to do  is have anyone available at the time (and there was always nurses and aides behind the nurses' station doing very little) to answer the lights if Plaintiff Nichols was busy with another resident.

14

56.     Plaintiff Nichols began giving Defendant Faulkner handwritten statements about resident abuse and neglect but nothing was done.   At one point, Plaintiff Nichols went to Defendant GCIA to report Defendant Faulkner to Defendant Kerr who at the time was HR manager. Defendant Kerr was informed of everything that was going on with regard to differential treatment of African-American staff at Defendant Shady Lane.   Nothing was done and nothing was done to Defendant Faulkner.   Plaintiff Nichols began getting fed up with nursing and put in a request to transfer to housekeeping which was a handwritten request.   Then Plaintiff Nichols began putting in requests to view her employee files all of which were effectively denied because Plaintiff Nichols never got any response back from Defendants.

57.     Also during Plaintiff Nichols' time working 3-11, Chrissy Esposti and Elenita Gaines would ask Plaintiff Nichols "hey Glenna do you swallow or spit when you suck dick." Chrissy, who was homosexual, also taped two oranges and a banana together in the form of a penis and testicles and taped it around her waist  in front of her groin  area  and  paraded it around the nurses' station for an about an hour.   Defendant Faulkner thought that was funny too.

58.     Esposti also took a resident's baby doll and tied it around her waist upside down as if the doll was her sexual partner parading around  like that for at least two hours in and out of residents' rooms doing patient care.  No nurses or supervisors would make her stop or say it was unacceptable.   When Defendant Faulkner was informed, she just blew it off.   Esposti also walked up to Plaintiff Nichols and said "I smell shit," referring to Plaintiff Nichols.

59.     Caucasian employees and supervisors thought this bullying of Plaintiff Nichols was just funny. Sometimes while working 3-11, Plaintiff Nichols and Terri Smith would hear monkey and gorilla sounds on the intercom over the top of the patients' beds where Plaintiff Nichols was working.  Despite complaints, nothing was done.

60.     Sylvia Murphy was hired as nurse manager and Defendants Faulkner and Strachan hired Murphy to write up all of the African-American nurses and aides.  Murphy will testify to an explicit conspiracy by these managerial Defendants of Defendants GCIA and Shady Lane to target African-American employees and enforce disparate discipline.

61.     At all times relevant to the present Complaint, Plaintiff Nichols was constantly emailing statements because if aides wrote statements with the incident reports that Defendant Faulkner did not approve, they would disappear and Defendant Faulkner would lie and say she never got it.

62.     Eventually, Sylvia Murphy began to see that Defendant Faulkner was using her to pretextually discipline African-Americans and Sylvia Murphy resigned as nurse manager.   In 2009, Defendant Shady Lane hired Defendant Higgins who said Defendant Faulkner hired Defendant Higgins to whip Defendant Shady Lane into shape with the same mandate that Sylvia Murphy had been given previously.

63.     Defendant Higgins told staff during the first nursing meeting that she conducted on September 25, 2009 that it was prohibited for anyone to smoke outside by Room 202.  As soon as the meeting was over, all the Caucasian nurses and aides who smoked went to that same prohibited area and lit up cigarettes with Defendant Higgins. African-American employees had to smoke in the designated smoking area further away and African-American employees were also told that cell phones were not to be used during working hours by anyone but while Defendant Higgins was announcing this at the meeting, Caucasian employee Samantha Kirwan was sitting right next to Defendant Higgins on the phone texting like it did not apply to her and nothing was said to her.  This meant that there were segregated smoking areas based upon race between 2009 and 2012 despite multiple complaints to Defendant Higgins.

64.    At that same meeting on September 23, 2009, staff were told that they had one week to get rid of the acrylic nails some of the African-American staff were wearing.   Plaintiff Nichols told Defendant Higgins that Plaintiff Nichols' nails were real.   A week later, Defendant Faulkner sent all the African-American and Hispanic staff home saying that they had to get their nails removed.   Bethany Britton, a Caucasian nurses aide, and other Caucasian nurses with acrylic nails were not sent home or suspended.   Plaintiffs' employment contract said that staff could wear nail polish and that the nail polish could not be chipped.   Plaintiff Nichols' nails were real but just had a hand painted designed.   Plaintiff Nichols was forced to go to her doctor and have her nails examined and the doctor gave Plaintiff Nichols a note saying that Plaintiff Nichols' nails were real.   The note was disregarded by Defendant Faulkner and Plaintiff Nichols was suspended.

65.    Plaintiff Nichols went to Defendant GCIA and reported the suspension issue to Defendant Kerr and Barbara Cramer, administrative assistant to David Shields, Director of Defendant GCIA.

66.    When Plaintiff Nichols returned to work, Plaintiff Nichols was still upset and anxious.  Defendant Faulkner sent Plaintiff Nichols to Life Care to their workers' compensation doctors and told them to examine Plaintiff Nichols' nails.  The doctor said that Plaintiff Nichols' nails were real and not acrylic or fake and also addressed the anxiety issue.  The doctor said that Plaintiff Nichols should be switched to a less stressful shift.  There was a position that opened on 11 to 7 but Defendant Faulkner tried to block that transfer on October 7, 2009.

67.    From 2009 until 2012, Plaintiff Nichols frequently complained to Defendant Higgins about a segregated smoking area that was set up by Defendant Higgins but nothing was done and the smoking areas remain largely racially segregated.

68.     Nurses Vicki Smith and Roxanne Sherry would come in the morning and bring up Plaintiff Nichols' emails on the PC and laugh at them while they were reading them.  Plaintiff Nichols began putting in multiple requests to transfer to housekeeping to get out of the line of fire in nursing.  Nurses Kim Mulligan, Vicki Smith, and Roxanne Sherry targeted Plaintiff Nichols by giving her the hardest assignments and giving Caucasian aides the easiest assignments.  Plaintiff Nichols was harassed with the bananas and monkey sounds on the intercom system, touching her on the face with a fake penis, and all kinds of other inappropriate discussions and behaviors.  Plaintiff Nichols complained to Defendant supervisors but, again, nothing was done.

69.     On October 28, 2009, a resident named Mr. ███████ had a bad night that started before Plaintiff Nichols got to work.  Plaintiff Nichols was falsely accused of verbally abusing Mr. ██████ and was suspended for five days pending investigation.  Defendant Strachan believed coworkers' lies. Plaintiff Nichols had to do an employee improvement plan, see a psychiatrist twice, and do in-services for something she did not do. This was all part of a progressive discipline that Defendant Faulkner was trying to use to make it easier to fire Plaintiff Nichols.

70.     Defendant Faulkner targeted African-American aides while there were valid complaints about Caucasian aides and nurses who physically and verbally abused residents but these incidents were covered up repeatedly and continuously.

71.     African-American aides would file grievances and write statements to try and keep Defendant Faulkner from smearing their good names but adverse reports are still in their files and they were dubbed the problem shift.

72.     Also on January 10, 2010, Caucasian Bethany Britton terrorized residents named ███████████████████████. The incidents were reported to Defendant Faulkner but nothing was done so a nurse and Plaintiff Nichols reported to incidents to the ombudsman. Defendant Faulkner made excuses for Bethany Britton. Another resident, Mrs. ██████, ended up with two black eyes and many female residents ended up with their pubic hair shaven. The ombudsman concluded that Bethany Britton sexually assaulted residents and Tom Sullivan, a former detective, came in and did an investigation. Britton was never prosecuted or internally disciplined and moved to Florida.

73.     Caucasian aide Crystal Weber-Gates did not follow the care plan and dropped a resident named ██████████ on the floor. Ms. █████ hurt her head and broke her hip and this was covered up. These cover ups of Caucasian worker error were frequent and Sylvia Murphy, a nurse manager went to Defendant GCIA to tell them what Defendant Faulkner and her team of nurses was doing. Nothing was done to Caucasian staff but an African-American nurse, named Tiffany, made a minor medical error that was made under the direction of a supervisor and she was terminated. There was ongoing differential treatment and discipline.

74.     After four requests and in March of 2012, Plaintiff Nichols eventually made it into housekeeping despite all the opposition from Defendant Faulkner. As soon as Plaintiff Nichols did transfer to housekeeping, Caucasian dayshift nurses began following Plaintiff Nichols all over the building to see if they could find something to report to Defendant Faulkner.

75.     Plaintiff Nichols still witnessed and complained of disparate treatment based upon race when she was in housekeeping between 2012 and 2017 and this included, *inter alia*, Defendants Faulkner and Higgins placing and ordering Caucasian subordinates to place X marks on patient bed sheets with black marker to double check to see if Plaintiffs Nichols and Clark

had changed sheets.  There was never such attempts to closely monitor Caucasian employees in the hope of exacting discipline.

76.     This targeting and harassment continued on an ongoing basis and on June 15, 2015, Kim Mulligan was at the nurses' station yelling at Defendants Faulkner and Higgins saying "this is not fair," "this is your fucking fault," "you are doing this to me."  Mulligan was walking up and down the halls kicking trashcans being very insubordinate to management and this went on for two weeks.   Defendants Faulkner and Higgins did nothing but at the same time they were harassing an African-American employee on 11-7 named Pearl and wrote her up for insubordination because they mandated her to stay and work on dayshift until Plaintiff Nichols got to work that morning.

77.     On June 16, 2015, Plaintiff Johnson witnessed Defendants Faulkner and Higgins trying to set up Plaintiff Clark by trying to make a patient say Plaintiff Clark was being mean and nasty to the patient.

78.     On June 24, 2015, Plaintiffs Nichols, Davis, and Johnson complained to Defendant Faulkner about continuous racial discrimination and disproportionate discipline. Again, nothing was done.

79.     On August 22, 2015, Caucasian Kim Mulligan was suspended for one day and Plaintiff Nichols came into work and found a monkey in her housekeeping cart.  Plaintiff Nichols reported it to Defendants Pepe and Baylor by text.  Mulligan was terminated for a medical error but was not disciplined for her racism.

80.     Caucasian employees Linda Thorne and her daughter Kelly Jones began smacking Plaintiff Nichols on her butt once or twice a month.  On September 29, 2015, Plaintiff Nichols

sent an email complaining to Defendants Baylor and Treffiletti letting them know how frustrated and violated she felt.

81.    On November 26, 2015, Plaintiff Nichols went to work on Thanksgiving Day and was not feeling well.  Plaintiff Nichols was approached by one of the Caucasian cooks named Cindy who walked up and asked Plaintiff Nichols what wrong and was her vagina hurting.  Another Caucasian female named Diane said Plaintiff Nichols' pussy is throbbing.  Plaintiff Nichols complained to Defendant Treffiletti who yelled at Plaintiff Nichols "all this craziness stops now."

82.    On April 13, 2016, Plaintiff was interrogated and accused of being a racist by a labor law attorney hired by Defendant GCIA and Shady Lane to investigate a complaint by the cook, Cindy.  This was another example of differential treatment based upon race, retaliation, and discrimination.

83.    On April 14, 2016, Plaintiff Nichols was interrogated by Defendants Treffiletti and Baylor about private texts and emails sent from Plaintiff Nichols' telephone when these communications were related to the discrimination and retaliation alleged herein.

84.    In January of 2014, Plaintiff Clark was summoned into the office because a resident ███ tube became unattached.  Plaintiff Clark was disciplined by Defendants Faulkner and Higgins but a Caucasian aide, Lucretia, was present and stated that the same thing had happened to her and she was never disciplined.

85.    In February of 2014, Plaintiff Clark was again summoned into the office because her Khios paperwork was not completed on time.  Defendants Faulkner and Higgins disciplined Plaintiff Clark. Caucasian employees Crystal and Kelly do not complete their Khios paperwork and were not disciplined.

86.     In March of 2014, Plaintiff Clark was again called into the office because a resident's shower was not completed.   Defendant Faulkner and Higgins were present and censured Plaintiff Clark.   Kelly, who is Caucasian, was not disciplined for not completing a resident's shower.

87.     In April of 2014, Plaintiff Clark was summoned to the office because a resident said that she gave a cold washcloth to him. Defendants Faulkner and Higgins disciplined Plaintiff Clark. This resident was a problem but when Caucasian workers had a problem with him there were no discipline given.

88.     In May of 2014, Plaintiff Clark was summoned to the office because a resident was found dry but her pants were wet. Defendants Faulkner and Higgins censured Plaintiff Clark but Lucretia, who is Caucasian, stated this has happened to her and she was never disciplined.

89.     In July of 2014, Plaintiff Clark was called into the office for a vacation time issue that already had been approved upon hiring and Plaintiff Clark was accused of not submitting paperwork in advance.   Vicky Smith, a Caucasian, has called in one week before taking a vacation the next week without submitting paperwork without any issue.

90.     In October of 2014, HR at Defendants GCIA and Shady Lane were made aware of a hostile race work environment by Plaintiff Clark and HR staff, Defendants Treffiletti and Baylor, admitted that issues were present. Defendant Strachan stated by letter that Defendants would address the issues and monitor the progress but this did not happen.   Instead, the issue was made worse because retaliation started.

91.     In December of 2014, Plaintiff Clark was summoned to the office by Defendants Faulkner and Higgins for not staying late when Crystal, a Caucasian coworker of Plaintiff Clark, did not stay and no discipline was given to her.   Plaintiff Clark was summoned to the office for

leaving a resident in the bathroom when all Caucasian employees would do the same but were never disciplined for it.

92.     In February of 2015, Plaintiff Clark was constantly being accused of negative body language by Defendants Faulkner and Baylor when Caucasian employee Vicki Smith exhibits negative body language all the time and has no reprimands or discipline.

93.     In March of 2015, Plaintiff Clark had to apply for FMLA which in thirty-five years of working she has never had to do. The doctor said it was due to stress from the job and Plaintiff Clark should try to find another job.

94.     In April of 2015, Plaintiff Clark sought to change shift because of ongoing racism and retaliation perpetuated by Defendants Faulkner and Higgins and their Caucasian underlings.

95.     In February of 2017, Eden Zackey at the direction of Defendant Faulkner wrote up Plaintiff Clark for conduct unbecoming in relation to a purported hall tray violation.  Plaintiff Clark had done nothing wrong and this issue was fabricated as retaliation for the filing of the present lawsuit.

96.     In April of 2017, Plaintiff Clark was forced to resign because of repeated racism and pretextual discipline and retaliation.   Even after Plaintiff Clark's resignation notice, Defendants Faulkner and Baylor cited Plaintiff Clark for insubordination when Plaintiff Clark was falsely accused of not signing a patient shower sheet and these Defendants suspended Plaintiff Clark for five days for false accusations of cumulative discipline.

97.     On August 31, 2016, an incident occurred in the dining room at Defendant Shady Lane with an employee Carrie Kugler, who is Caucasian, was yelling at a family member in front of residents and other coworkers.  Following reports to Defendant Baylor, she stated that the family member is crazy and not to worry about her.  Again, there was no discipline for Kugler

but African-American employees, such as Plaintiffs, are repeatedly disciplined for minor of fabricated infractions.

98.     At all times mentioned in the present second amended Complaint, all Plaintiffs were aware and witnessed racial discrimination even if each individual Plaintiff was not the target of individual instances of racial discrimination and this placed each Plaintiff in fear of racial discrimination and all Plaintiffs justifiably believed that all Defendants engaged in ongoing practices of direct racism, disparate treatment based upon race, and repeated retaliation for complaining about racial discrimination.

99.     In February of 2017, Defendants GCIA and Shady Lane decided to outsource Maintenance and Environmental Services.  These departments employed Plaintiffs Johnson and Nichols as well four other African-Americans and this decision followed the filing the present lawsuit.  In Environmental Service, six out of seven employees were at the time African-American and the decision was retaliatory in relation to Plaintiffs Johnson and Nichols.  In addition, the decision was made because all Defendants have failed to respond to allegations of racial discrimination and it is more racially efficient for Defendants GCIA and Shady Lane to do away with this department rather than address meritorious complaints of racism.

100.     Since the filing of the present lawsuit, all four Plaintiffs have been sent home from work.  Plaintiffs Johnson and Davis were sent home by Defendant Pepe.  Plaintiff Nichols was sent home by Defendant Faulkner and Linda Thorne.  Plaintiff Clarke was sent home by Defendant Faulkner and Eden Zackey.  This discipline is pretextual and retaliatory and no other employee, other than Robin Atkinson who was involved in a fictitious incident with Plaintiff Davis, has been sent home since this lawsuit was filed on November 16, 2016.

**COUNT ONE:  42 U.S.C. § 1983 VIOLATION OF THE**
**EQUAL PROTECTION CLAUSE BY ALL PLAINTIFFS**
**AGAINST DEFENDANT TREFFILETTI**

101.    Paragraphs 1 through 100 are incorporated herein by reference as though fully set forth.

102.    Defendant Treffiletti is a HR Director and EEO Director and has held one or both of these positions since approximately 2012.

103.    Defendant Treffiletti has engaged in direct discrimination based upon race against each Plaintiff.

104.    Defendant Treffiletti has pretextually punished each Plaintiff for no reason and when similarly placed Caucasian employees are not punished for the same activities.

105.    Defendant Treffiletti has failed to act despite meritorious complaints that have been brought to Defendant Treffiletti by all Plaintiffs.

106.    Defendant Treffiletti has engaged in a continuing violation of all Plaintiff's Equal protection rights since he has been employed at Defendants GCIA and Shady Lane.

107.    Defendant Treffiletti has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiffs' Equal Protection Clause rights.

108.    These actions include, but are not limited to, terminating Plaintiff Johnson, demoting Plaintiff Davis, interrogating Plaintiff Nichols about private emails and texts on her cell phone, and acknowledging to Plaintiff Clark that there was a racially hostile work environment but doing nothing about it despite having the power to do so and Defendant Treffiletti allowed retaliation against Plaintiff Clark.

109.    All Plaintiffs should, therefore, be compensated to redress the Constitutional violating actions of Defendant Treffiletti.

25

**COUNT TWO:  42 U.S.C. § 1983 VIOLATION OF THE
EQUAL PROTECTION CLAUSE OF THE FOURTEENTH
AMENDMENT BY PLAINTIFFS DAVIS, NICHOLS, AND
CLARK AGAINST DEFENDANT FAULKNER**

110.    Paragraphs 1 through 109 are incorporated herein by reference as though fully set

forth.

111.    Defendant Faulkner is a Director of Nursing and has held that position or a similar

position since approximately 2003.

112.    Defendant Faulkner has engaged in direct discrimination based upon race against

Plaintiffs Davis, Nichols, and Clark.

113.    Defendant Faulkner has pretextually punished Plaintiffs Davis, Nichols, and Clark

for no reason and when similarly placed Caucasian employees are not punished for the same

activities.

114.    Defendant Faulkner has failed to act despite meritorious complaints that have

been brought to Defendant Faulkner by Plaintiffs Davis, Nichols, and Clark.

115.    Defendant Faulkner has engaged in a continuing violation of Plaintiffs Davis,

Nichols, and Clark's Equal Protection rights since at least 2005.

116.    Defendant Faulkner has engaged in an ongoing and continuing conspiracy with all

other Defendants to violate all Plaintiffs Davis, Nichols, and Clark's Equal Protection Clause

rights.

117.    These actions include, but are not limited to, making Plaintiff Davis work when

Plaintiff Davis informed defendant Faulkner of pain from a work injury, suspending Plaintiff

Nichols for no reason, and suspending Plaintiff Clark for no reason when informed of Plaintiff

Clark's recent forced resignation.

118.    Plaintiffs Davis, Nichols, and Clark should, therefore, be compensated to redress

26

the Constitutional violating actions of Defendant Faulkner.

## COUNT THREE:  42 U.S.C. § 1983 VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS AGAINST DEFENDANT BAYLOR

119.    Paragraphs 1 through 118 are incorporated herein by reference as though fully set forth.

120.    Defendant Baylor is an Administrator and has this or a similar position since approximately 2001.

121.    Defendant Baylor has engaged in direct discrimination based upon race against each Plaintiff.

122.    Defendant Baylor has pretextually punished each Plaintiff for no reason and when similarly placed Caucasian employees are not punished for the same activities.

123.    Defendant Baylor has failed to act despite meritorious complaints that have been brought to Defendant Baylor by all Plaintiffs.

124.    Defendant Baylor has engaged in a continuing violation of all Plaintiff's Equal protection rights since he has been employed at Defendants GCIA and Shady Lane.

125.    Defendant Baylor has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiffs' Equal Protection Clause rights.

126.    These actions include, but are not limited to, terminating Plaintiff Johnson on multiple occasions and retaliating against her, leveling false accusations of patient mistreatment against Plaintiff Davis and retaliating against her when she was vindicated, ignoring Plaintiff Nichols' emails regarding racial abuse, and disciplining Plaintiff Clark based upon false accusations of insubordination.

127.    All Plaintiffs should, therefore, be compensated to redress the Constitutional

27

violating actions of Defendant Baylor.

**COUNT FOUR:  42 U.S.C. § 1983 VIOLATION OF THE
EQUAL PROTECTION CLAUSE OF THE FOURTEENTH
AMENDMENT BY ALL PLAINTIFFS AGAINST
DEFENDANT STRACHAN**

128.    Paragraphs 1 through 127 are incorporated herein by reference as though fully set forth.

129.    Defendant Strachan was an Administrator at Defendant Shady Lane, is presently acting Director of Defendant GCIA, and has been employed there since approximately 2001.

130.    Defendant Strachan has engaged in direct discrimination based upon race against each Plaintiff.

131.    Defendant Strachan has pretextually punished each Plaintiff for no reason and when similarly placed Caucasian employees are not punished for the same activities.

132.    Defendant Strachan has failed to act despite meritorious complaints that have been brought to Defendant Strachan by all Plaintiffs.

133.    Defendant Strachan has engaged in a continuing violation of all Plaintiffs' Equal protection rights since he has been employed at Defendants GCIA and Shady Lane.

134.    Defendant Strachan has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiffs' Equal Protection Clause rights.

135.    These actions include, but are not limited to, withholding Plaintiff Johnson's pay increase despite her being promoted, retaliating against Plaintiff Davis for bringing the NAACP to Defendant Shady Lane, putting Plaintiff Nichols on a discipline plan and making her see a psychiatrist, writing to Plaintiff Clark about complaints of a racially hostile work environment and then doing nothing and allowing retaliation, and hiring Sylvia Murphy with the explicit instruction to write up all of the African-American nurses and aides and to target African-

28

American employees and enforce disparate discipline based upon race.

136.    All Plaintiffs should, therefore, be compensated to redress the Constitutional violating actions of Defendant Strachan.

**COUNT FIVE:  42 U.S.C. § 1983 VIOLATION OF THE
EQUAL PROTECTION CLAUSE OF THE FOURTEENTH
AMENDMENT BY PLAINTIFF JOHNSON AGAINST
DEFENDANT ROCABALDI**

137.    Paragraphs 1 through 136 are incorporated herein by reference as though fully set forth.

138.    Defendant Rocabaldi was a Supervisor of Environmental Services from approximately 2010 until 2012.

139.    Defendant Rocabaldi has engaged in direct discrimination based upon race against Plaintiff Johnson.

140.    Defendant Rocabaldi has pretextually punished Plaintiff Johnson for no reason and when similarly placed Caucasian employees are not punished for the same activities.

141.    Defendant Rocabaldi has failed to act despite meritorious complaints that have been brought to Defendant Rocabaldi by Plaintiff Johnson.

142.    Defendant Rocabaldi has engaged in a continuing violation of Plaintiff Johnson's Equal Protection rights since at least 2010.

143.    Defendant Rocabaldi has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiff Johnson's Equal Protection Clause rights.   In particular, Defendant Rocabaldi conspired with Defendants Baylor, D'Angelo, and Treffiletti to retaliate against Plaintiff Johnson upon her return to work in 2013 and Defendant Rocabaldi conspired with these Defendants to pretextually investigate Plaintiff Johnson, including Defendant Rocabaldi sending someone to Plaintiff Johnson's grandmother's funeral to see if

29

Plaintiff Johnson was there.

144.    It does not matter if Defendant Rocabaldi left the conspiracy because he left Defendant Shady Lane.  The conspiracy constitutes a continuing violation because the same or similar racist conduct occurs to Plaintiff Johnson and Defendant Rocabaldi's involvement in the conspiracy allowed the conspiracy to foment and continue.

145.    These actions include, but are not limited to, Defendant Rocabaldi stating that Plaintiff Johnson was angry and had a chip on her shoulder and baseless write ups of Plaintiff Johnson as well as allegations that Plaintiff Johnson was a liar.

146.    Plaintiff Johnson should, therefore, be compensated to redress the Constitutional violating actions of Defendant Rocabaldi.

## COUNT SIX:  42 U.S.C. § 1983 VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BY PLAINTIFF JOHNSON AGAINST DEFENDANT D'ANGELO

147.    Paragraphs 1 through 146 are incorporated herein by reference as though fully set forth.

148.    Defendant D'Angelo is Head of Maintenance and Environmental Management and has been in that or a similar position since approximately 2002.

149.    Defendant D'Angelo has engaged in direct discrimination based upon race against Plaintiff Johnson.

150.    Defendant D'Angelo has pretextually punished Plaintiff Johnson for no reason and when similarly placed Caucasian employees are not punished for the same activities.

151.    Defendant D'Angelo has failed to act despite meritorious complaints that have been brought to Defendant D'Angelo by Plaintiff Johnson.

152.    Defendant D'Angelo has engaged in a continuing violation of Plaintiff Johnson's

Equal Protection rights since at least 2010.

153.    Defendant D'Angelo has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiff Johnson's Equal Protection Clause rights.

154.    These actions include, but are not limited to, Defendant D'Angelo retaliating against Plaintiff Johnson and writing her up upon her return to work in 2013.  Plaintiff Johnson had previously complained about Defendant D'Angelo calling a coworker a Nigger.

155.    Plaintiff Johnson should, therefore, be compensated to redress the Constitutional violating actions of Defendant D'Angelo.

**COUNT SEVEN:  42 U.S.C. § 1983 VIOLATION OF THE
EQUAL PROTECTION CLAUSE OF THE FOURTEENTH
AMENDMENT BY PLAINTIFFS JOHNSON AND DAVIS
AGAINST DEFENDANT PEPE**

156.    Paragraphs 1 through 155 are incorporated herein by reference as though fully set forth.

157.    Defendant Pepe is Supervisor of Environmental and Food Services and has been in that or a similar position since approximately 2012.

158.    Defendant Pepe has engaged in direct discrimination based upon race against Plaintiffs Johnson and Davis.

159.    Defendant Pepe has pretextually punished Plaintiffs Johnson and Davis for no reason and when similarly placed Caucasian employees are not punished for the same activities.

160.    Defendant Pepe has failed to act despite meritorious complaints that have been brought to Defendant Pepe by Plaintiffs Johnson and Davis.

161.    Defendant Pepe has engaged in a continuing violation of Plaintiff Johnson and Davis' Equal Protection rights since at least 2012.

162.    Defendant Pepe has engaged in an ongoing and continuing conspiracy with all

31

other Defendants to violate all Plaintiffs Johnson and Davis' Equal Protection Clause rights.

163.    These actions include, but are not limited to, Defendant Pepe terminating and retaliating against Plaintiff Johnson and requesting doctor's notes upon her return to work in 2013 and disciplining Plaintiff Davis for using the word "the" in a conversation with coworker Robin Atkinson and Defendant Pepe stated that the word "the" would be construed as a threat in a court of law.

164.    Plaintiffs Johnson and Davis should, therefore, be compensated to redress the Constitutional violating actions of Defendant Pepe.

**COUNT EIGHT:  42 U.S.C. § 1983 VIOLATION OF THE
EQUAL PROTECTION CLAUSE OF THE FOURTEENTH
AMENDMENT BY PLAINTIFF JOHNSON AGAINST
DEFENDANT KERR**

165.    Paragraphs 1 through 164 are incorporated herein by reference as though fully set forth.

166.    Defendant Kerr was HR Director from approximately 2009 until 2015.

167.    Defendant Kerr has engaged in direct discrimination based upon race against Plaintiff Johnson.

168.    Defendant Kerr has pretextually punished Plaintiff Johnson for no reason and when similarly placed Caucasian employees are not punished for the same activities.

169.    Defendant Kerr has failed to act despite meritorious complaints that have been brought to Defendant Kerr by Plaintiff Johnson.

170.    Defendant Kerr has engaged in a continuing violation of Plaintiff Johnson's Equal Protection rights since at least 2009.

171.    Defendant Kerr has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiff Johnson's Equal Protection Clause rights.  In particular,

Defendant Kerr conspired with Defendants Baylor, D'Angelo, and Treffiletti to retaliate against Plaintiff Johnson upon her return to work in 2013 and Defendant Kerr conspired with these Defendants to falsely and repeatedly label Plaintiff Johnson as angry with a chip on her shoulder and Defendant Kerr oversaw Plaintiff Johnson's return to work at a lower rate of pay than when she was terminated in violation of the CBA and in retaliation for complaints to Defendant Kerr about racial discrimination which were not acted upon by Defendant Kerr despite her having the power to do so.

172.    It does not matter if Defendant Kerr left the conspiracy because he left Defendant Shady Lane.  The conspiracy constitutes a continuing violation because the same or similar racist conduct occurs to Plaintiff Johnson and Defendant Kerr's involvement in the conspiracy allowed the conspiracy to foment and continue.

173.    These actions include, but are not limited to, Defendant Kerr stating that Plaintiff Johnson was angry and had a chip on her shoulder and baseless write ups of Plaintiff Johnson.

174.    Plaintiff Johnson should, therefore, be compensated to redress the Constitutional violating actions of Defendant Kerr.

**COUNT NINE:  42 U.S.C. § 1983 VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS AGAINST DEFENDANT HIGGINS**

175.    Paragraphs 1 through 174 are incorporated herein by reference as though fully set forth.

176.    Defendant Higgins was a former Nurse Manager at Defendant Shady Lane and was employed there from approximately 2009 until 2016.

177.    Defendant Higgins has engaged in direct discrimination based upon race against each Plaintiff.

33

178.    Defendant Higgins has pretextually punished each Plaintiff for no reason and when similarly placed Caucasian employees are not punished for the same activities.

179.    Defendant Higgins has failed to act despite meritorious complaints that have been brought to Defendant Higgins by all Plaintiffs.

180.    Defendant Higgins has engaged in a continuing violation of all Plaintiffs' Equal protection rights since he has been employed at Defendants GCIA and Shady Lane.

181.    Defendant Higgins has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiffs' Equal Protection Clause rights.

182.    These actions include, but are not limited to, setting up segregated smoking areas by threatening to punish African-Americans if they smoked in a particular area but allowing Caucasian employees to smoke in that same area, falsely accusing Plaintiff Davis of injuring a patient based upon racial animus which adversely affected Plaintiff Davis' career between 2011 and 2015, and disparately disciplining Plaintiff Clark because of her race.

183.    All Plaintiffs should, therefore, be compensated to redress the Constitutional violating actions of Defendant Higgins.

### COUNT TEN:  42 U.S.C. § 1983 VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS AGAINST DEFENDANTS GCIA AND SHADY LANE

184.    Paragraphs 1 through 183 are incorporated herein by reference as though fully set forth.

185.    Defendants Shady Lane and GCIA have a custom and/or policy of disparately treating African-American employees and retaliating against African-American employees when compared to Caucasian employees thereby denying African-American employees the equal benefit of their contracted positions and subjecting them to unequal punishments.  With regard to

the present African-American Plaintiffs and many other employees, there is a intentional policy of treating African-Americans, like Plaintiffs, more harshly in terms of conditions of employment, in disciplinary contexts, and in retaliation for speaking out against unequal treatment.

186.    Defendants Shady Lane and GCIA, through their supervisory and subordinate Defendants, act under a policy that treats African-Americans differently and treated Plaintiffs differently when compared to similarly-situated Caucasian employees.

187.    The factual examples are numerous and include, but are not limited to, Defendants Faulkner and Strachan hiring Sylvia Murphy to target and write up all of the African-American nurses and aides and enforce disparate discipline, all of the individual Defendant supervisors continuously enforcing disparate discipline against African-Americans including Plaintiffs, wholesale and purposeful failure to address meritorious complaints regarding racial discrimination, racially segregated smoking areas, repeated termination and reinstatement of African-American employees including Plaintiffs, retaliation for complaints regarding racism including lowering wages, disparate monitoring of African-American in the hope of enacting further discipline, unabated monkey sounds over the intercom, and racist language.

188.    All Plaintiffs should, therefore, be compensated to redress the Constitutional violating customs and policies of Defendants GCIA and Shady Lane.

### COUNT ELEVEN:  42 U.S.C. § 1983 VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS (CONSPIRACY)

189.    Paragraphs 1 through 188 are incorporated herein by reference as though fully set forth.

190.    All Defendants acted in a conspiracy and used this racist policy to deliberately

perpetuate discrimination and retaliation against Plaintiffs and all Defendants also engaged in a deliberate practice of racial discrimination and retaliation against Plaintiffs with ongoing pretextual discipline and retaliation for protected complaints.

191.   Defendants Baylor, Treffiletti, D'Angelo, Kerr, Rocabaldi, and Pepe conspired to terminate and then retaliate against Plaintiff Johnson upon her return to work by lowering her pay, excessively monitoring Plaintiff Johnson and writing her up, and labeling her angry with a chip on her shoulder.

192.   Defendants Faulkner, Baylor, Higgins, Treffiletti, and Pepe conspired against Plaintiff Davis by falsely accusing her of injuring a patient, by retaliating against Plaintiff Davis and lowering her pay upon return to work, and by jointly enforcing meritless discipline against Plaintiff Davis.

193.   Defendants Faulkner, Strachan, Kerr, and Higgins jointly ignored Plaintiff Nichols' complaints regarding racial discrimination and failed to act, they jointly permitted racially-motivated bullying of Plaintiff Nichols and participated therein, and engaged is racially disparate discipline and retaliation including sending non-Caucasians home from work for no reason.

194.   Defendants Faulkner, Higgins, Treffiletti, Baylor and Strachan all engaged in and permitted the racially-motivate disciplining and retaliation of Plaintiff Clark to occur. Defendants Treffiletti and Baylor acknowledged that there was a racially hostile work environment at Defendants GCIA and Shady Lane.   Defendant Strachan said he would investigate same.   Regardless, direct racism and retaliation was allowed to continue unabated in relation to Plaintiff Clark as well as all Plaintiffs.

195.   Defendants Faulkner and Strachan hired Sylvia Murphy to target and write up all

36

of the African-American nurses and aides and enforce disparate discipline.

196.    All of the individually-named Defendants are or were closely involved in the chain of command.  They have all been accused of direct racial discrimination and/or failure to rectify racial discrimination and thereby allow same to permeate at Defendants GCIA and Shady Lane.

197.    Complaints of racial discrimination have, at various times, been directed to all Defendants.

198.    The joint involvement in direct discrimination, as well as the continued sanctioning of racism and segregation, is indicative of a continuing racial conspiracy, directly and circumstantially, by all Defendants.

199.    All Defendants were involved in a Constitutional-violating conspiracy to aid and abet in the purposeful perpetuation of unequal practices and procedures and all individually-named Defendants acted under color of state law and Defendants' actions caused economic, vocational, and psychological damages to Plaintiffs for which Defendants should compensate Plaintiffs.

### COUNT TWELVE:  42 U.S.C. § 1981 THROUGH 42 U.S.C. § 1983 EQUAL PROTECTION CLAUSE VIOLATION OF THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS AND AGAINST DEFENDANT TREFFILETTI

200.    Paragraphs 1 through 199 are incorporated herein by reference as though fully set forth.

201.    Defendant Treffiletti has denied all African-American Plaintiffs the security of persons and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane and Defendant Treffiletti has subjected all Plaintiffs to differential punishment, pains, penalties, and other exactions based upon Plaintiffs' race and in violation of the Equal Protection Clause of the

Fourteenth Amendment.

202.    All Plaintiffs should therefore, be compensated for Defendant Treffiletti's violation of 42 U.S.C. § 1981.

**COUNT THIRTEEN:  42 U.S.C. § 1981 THROUGH 42 U.S.C.
§ 1983 EQUAL PROTECTION CLAUSE VIOLATION OF
THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS
AND AGAINST DEFENDANT FAULKNER**

203.    Paragraphs 1 through 202 are incorporated herein by reference as though fully set forth.

204.    Defendant Faulkner has denied all African-American Plaintiffs the security of persons and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane and Defendant Faulkner has subjected all Plaintiffs to differential punishment, pains, penalties, and other exactions based upon Plaintiffs' race and in violation of the Equal Protection Clause of the Fourteenth Amendment.

205.    All Plaintiffs should, therefore, be compensated for Defendant Faulkner's violation of 42 U.S.C. § 1981.

**COUNT FOURTEEN:  42 U.S.C. § 1981 THROUGH 42 U.S.C.
§ 1983 EQUAL PROTECTION CLAUSE VIOLATION OF
THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS
AGAINST DEFENDANT BAYLOR**

206.    Paragraphs 1 through 205 are incorporated herein by reference as though fully set forth.

207.    Defendant Baylor has denied all African-American Plaintiffs the security of persons and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane and Defendant Baylor has subjected all Plaintiffs to differential punishment, pains, penalties, and other exactions based upon Plaintiffs' race and in violation of the Equal Protection Clause of the Fourteenth Amendment.

208.    All Plaintiffs should, therefore, be compensated for Defendant Baylor's violation of

42 U.S.C. § 1981.

### COUNT FIFTEEN:  42 U.S.C. § 1981 THROUGH 42 U.S.C. § 1983 EQUAL PROTECTION CLAUSE VIOLATION OF THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS AGAINST DEFENDANT STRACHAN

209.    Paragraphs 1 through 208 are incorporated herein by reference as though fully set

forth.

210.    Defendant Strachan has denied all African-American Plaintiffs the security of persons

and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane and

Defendant Strachan has subjected all Plaintiffs to differential punishment, pains, penalties, and other

exactions based upon Plaintiffs' race and in violation of the Equal Protection Clause of the

Fourteenth Amendment.

211.    All Plaintiffs should, therefore, be compensated for Defendant Strachan's violation of

42 U.S.C. § 1981.

### COUNT SIXTEEN:  42 U.S.C. § 1981 THROUGH 42 U.S.C. § 1983 EQUAL PROTECTION CLAUSE VIOLATION OF THE FOURTEENTH AMENDMENT BY PLAINTIFF JOHNSON AGAINST DEFENDANT ROCABALDI

212.    Paragraphs 1 through 211 are incorporated herein by reference as though fully set

forth.

213.    Defendant Rocabaldi has denied African-American Plaintiff Johnson the security of

persons and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane

and Defendant Rocabaldi has subjected Plaintiff Johnson to differential punishment, pains, penalties,

and other exactions based upon Plaintiff Johnson's race and in violation of the Equal Protection

Clause of the Fourteenth Amendment.

214.    Plaintiff Johnson should, therefore, be compensated for Defendant Rocabaldi's

violation of 42 U.S.C. § 1981.

### COUNT SEVENTEEN:  42 U.S.C. § 1981 THROUGH 42
### U.S.C. § 1983 EQUAL PROTECTION CLAUSE VIOLATION
### OF THE FOURTEENTH AMENDMENT BY PLAINTIFF
### JOHNSON AGAINST DEFENDANT D'ANGELO

215.    Paragraphs 1 through 214 are incorporated herein by reference as though fully set forth.

216.    Defendant D'Angelo has denied African-American Plaintiff Johnson the security of persons and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane and Defendant D'Angelo has subjected Plaintiff Johnson to differential punishment, pains, penalties, and other exactions based upon Plaintiff Johnson's race and in violation of the Equal Protection Clause of the Fourteenth Amendment.

217.    Plaintiff Johnson should, therefore, be compensated for Defendant D'Angelo's violation of 42 U.S.C. § 1981.

### COUNT EIGHTEEN:  42 U.S.C. § 1981 THROUGH 42 U.S.C.
### § 1983 EQUAL PROTECTION CLAUSE VIOLATION OF
### THE FOURTEENTH AMENDMENT BY PLAINTIFFS
### JOHNSON AND DAVIS AGAINST DEFENDANT PEPE

218.    Paragraphs 1 through 217 are incorporated herein by reference as though fully set forth.

219.    Defendant Pepe has denied African-American Plaintiffs Johnson and Davis the security of persons and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane and Defendant Pepe has subjected Plaintiffs Johnson and Davis to differential punishment, pains, penalties, and other exactions based upon Plaintiff Johnson's race and in violation of the Equal Protection Clause of the Fourteenth Amendment.

220.    Plaintiffs Johnson and Davis should, therefore, be compensated for Defendant Pepe's violation of 42 U.S.C. § 1981.

**COUNT NINETEEN:  42 U.S.C. § 1981 THROUGH 42 U.S.C.
§ 1983 EQUAL PROTECTION CLAUSE VIOLATION OF
THE FOURTEENTH AMENDMENT BY PLAINTIFF
JOHNSON AGAINST DEFENDANT KERR**

221.    Paragraphs 1 through 220 are incorporated herein by reference as though fully set forth.

222.    Defendant Kerr has denied African-American Plaintiff Johnson the security of persons and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane and Defendant Kerr has subjected Plaintiff Johnson to differential punishment, pains, penalties, and other exactions based upon Plaintiff Johnson's race and in violation of the Equal Protection Clause of the Fourteenth Amendment.

223.    Plaintiff Johnson should, therefore, be compensated for Defendant Kerr's violation of 42 U.S.C. § 1981.

**COUNT TWENTY:  42 U.S.C. § 1981 THROUGH 42 U.S.C. §
1983 EQUAL PROTECTION CLAUSE VIOLATION OF
THE FOURTEENTH AMENDMENT BY ALL PLAINTIFFS
AGAINST DEFENDANT HIGGINS**

224.    Paragraphs 1 through 223 are incorporated herein by reference as though fully set forth.

225.    Defendant Higgins has denied all African-American Plaintiffs the security of persons and property as is enjoyed by Caucasian employees at Defendants GCIA and Shady Lane and Defendant Higgins has subjected all Plaintiffs to differential punishment, pains, penalties, and other exactions based upon Plaintiffs' race and in violation of the Equal Protection Clause of the Fourteenth Amendment.

226.    All Plaintiffs should, therefore, be compensated for Defendant Higgins' violation of 42 U.S.C. § 1981.

**COUNT TWENTY-ONE:  42 U.S.C. § 1981 THROUGH 42
U.S.C. § 1983 EQUAL PROTECTION CLAUSE VIOLATION
OF THE FOURTEENTH AMENDMENT BY ALL
PLAINTIFFS AGAINST ALL DEFENDANTS
(CONSPIRACY)**

227.    Paragraphs 1 through 226 are incorporated herein by reference as though fully set

forth.

228.    All Defendants, acting in a Constitutional-violating conspiracy, have denied all

African-American Plaintiffs the security of persons and property as is enjoyed by Caucasian

employees at Defendants GCIA and Shady Lane and all Defendants have subjected all Plaintiffs to

differential punishment, pains, penalties, and other exactions based upon Plaintiffs' race and in

violation of the Equal Protection Clause of the Fourteenth Amendment.

229.    All Plaintiffs should, therefore, be compensated for all Defendants' violation of 42

U.S.C. § 1981.

**COUNT TWENTY-TWO:  42 U.S.C. § 1981 THROUGH 42
U.S.C. § 1983 EQUAL PROTECTION CLAUSE VIOLATION
OF THE FOURTEENTH AMENDMENT BY ALL
PLAINTIFFS AGAINST DEFENDANTS GCIA AND SHADY
LANE**

230.    Paragraphs 1 through 229 are incorporated herein by reference as though fully set

forth.

231.    Defendants GCIA and Shady Lane, through their racist customs and policies, have

denied all African-American Plaintiffs the security of persons and property as is enjoyed by

Caucasian employees at Defendants GCIA and Shady Lane and Defendants GCIA and Shady Lane

have subjected all Plaintiffs to customs and policies which result in differential punishment, pains,

penalties, and other exactions based upon Plaintiffs' race and in violation of the Equal Protection

Clause of the Fourteenth Amendment.

232.    All Plaintiffs should, therefore, be compensated for Defendants GCIA and Shady

Lane's violation of 42 U.S.C. § 1981.

## COUNT TWENTY-THREE:  NEW JERSEY LAW AGAINST DISCRIMINATION VIOLATIONS BY ALL PLAINTIFFS AGAINST DEFENDANTS SHADY LANE AND GCIA – DISCRIMINATION ON THE BASIS OF RACE AND HOSTILE WORK ENVIRONMENT

233.    Paragraphs 1 through 232 are incorporated herein by reference as though fully set forth.

234.    Defendants Shady Lane and GCIA discriminated against Plaintiffs based upon race creating a hostile work environment because the racial discrimination is severe and pervasive.

235.    These actions were in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12.

236.    Defendants Shady Lane and GCIA acted in a manner that led to the treatment of Plaintiffs in a manner that was wholly at odds with similarly-situated Caucasian employees, Plaintiffs suffered ongoing retaliation because of EEO-related complaints, and their complaints and requests for accommodation were ignored or led to further retaliation.

237.    The harm suffered by Plaintiffs was continuous, severe, and pervasive over all of the periods detailed and Plaintiffs were subjected to severe psychological injury to be proven at trial.

238.    No other similarly-placed Caucasian employees were ever treated similarly to Plaintiffs and Plaintiffs' complaints regarding disparate treatment were ignored and/or led to retaliation, despite, for example, Defendants Treffiletti and Baylor acknowledging to Plaintiff Clark that there is a racially hostile work environment at Defendants GCIA and Shady Lane.

239.    The allegations herein alleged would not have occurred but for Plaintiffs' race,

the racism and retaliation alleged is severe and/or pervasive and would make any African-American person in a similar position believe that the environment was hostile.

240.    Racism includes but is not limited to excessive minoring of African-American Plaintiffs, disparate punishment, direct racist language and monkey chanting over the workplace intercom, decreasing wages, an utter failure to address meritorious complaints, repeated and ongoing retaliation, and actual and constructive discharge.

241.    As a result of Defendants GCIA and Shady Lane's race discrimination, as well as a failure to respond to Plaintiffs' meritorious complaints, all Plaintiffs suffered economic, vocational, and psychological damages for which Defendants Shady Lane and GCIA should compensate all Plaintiffs.

**COUNT TWENTY-FOUR:  NEW JERSEY LAW AGAINST DISCRIMINATION VIOLATIONS BY ALL PLAINTIFFS AGAINST DEFENDANTS SHADY LANE AND GCIA – RETALIATION ON THE BASIS OF RACE AND IN RESPONSE TO PROTECTED ACTIVITY**

242.    Paragraphs 1 through 241 are incorporated herein by reference as though fully set forth.

243.    Defendants GCIA and Shady Lane have retaliated against and continue to retaliate against all Plaintiffs because of Plaintiffs' protected race discrimination complaints.

244.    Plaintiffs have been, *inter alia*, punished, terminated, and suspended for complaining about racism at Defendants GCIA and Shady Lane.

245.    Since the filing of the present lawsuit and in February of 2017, Defendants GCIA and Shady Lane decided to outsource Maintenance and Environmental Services.  These departments employed Plaintiffs Johnson and Nichols as well four other African-Americans.  In Environmental Service, six out of seven employees were at the time African-American and the

decision was retaliatory in relation to Plaintiffs Johnson and Nichols.

246.   Since the filing of the present lawsuit, all four Plaintiffs have been sent home from work.  This discipline is pretextual and retaliatory.

247.   Since the filing of the present lawsuit, Plaintiff Johnson has been terminated for no valid reason, Plaintiff Clark has been suspended and forced to resign, and Plaintiffs Davis and Nichols have also faced baseless and racist discipline.

248.   This retaliation is part of a pattern where African-American employees are disciplined and retaliated against when vindicated by having the terms of employed detrimentally altered and then being subjected to further retaliation in the form of excessive scrutiny.

249.   Plaintiffs have continually complained about these forms of retaliations to which no similarly-place Caucasian employees are subjected.

250.   The present retaliation is unseen and unforeseen in any other context and constitutes arrogance and direct flouting of the authority of this Court.

251.   As a result of Defendants GCIA and Shady Lane's institutionalized retaliation, all Plaintiffs suffered economic, vocational, and psychological damages for which Defendants GCIA and Shady Lane should compensate all Plaintiffs.

## WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS PRAY:

1.   Order Defendants to make Plaintiffs, insofar as they were adversely affected by the described practices, whole by providing appropriate back pay and reimbursement for lost pay, experience, and other benefits in an amount to be shown at trial.  Grant Plaintiffs emotional damages for pain and suffering that has resulted from Defendants' actions.

2.   Grant Plaintiffs their attorneys' fees, costs, and disbursements.

3.   Grant Plaintiffs pre-judgment and post-judgment interest.

4.      Grant additional relief as the Court deems just and proper including, but not limited to, punitive damages, where appropriate, to counter the malicious, deliberate, willful, and racist misconduct and targeted retaliation that Plaintiffs suffered and to discourage future deliberate and racist similar practices and widespread and outrageous institutionalized racism.

## Demand for Jury Trial

Plaintiffs hereby demand a jury trial.

## Local Civil Rule 11.2 Certification

Pursuant to Local Rule 11.2, I hereby certify that the above-captioned matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Respectfully submitted,

**The O'Hanlon Law Firm, P.C.**

_____
STEPHEN T. O'HANLON, ESQUIRE

DATE:  April 14, 2017

Stephen T. O'Hanlon, Esquire
NJ Bar ID # 027612008
The O'Hanlon Law Firm, P.C.
2 Penn Center Plaza, Suite 1850
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
Tel: 267.546.9066
Fax: 215.567.1998
steve@ohanlonlawfirm.com
Attorney for Plaintiffs

46

## CERTIFICATE OF SERVICE

I, Stephen T. O'Hanlon, Esquire, hereby certify that on April 14, 2017 the above second

amended Complaint was served by opt-in ECF service upon counsel of record for all Defendants.

**The O'Hanlon Law Firm, P.C.**

/s//

_____

STEPHEN T. O'HANLON, ESQUIRE

Stephen T. O'Hanlon, Esquire
NJ Bar # 027612008
The O'Hanlon Law Firm, P.C.
2 Penn Center Plaza, Suite 1850
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
Tel: 267.546.9066
Fax: 215.567.1998
steve@ohanlonlawfirm.com
Attorney for Plaintiffs

47