## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| MARCELLA JOHNSON, BETTY DAVIS, GLENNA NICHOLS, and SWARDELLA CLARK, | |
| Plaintiffs, | Civil No. 16-8422 (RMB/AMD) |
| v. | **OPINION** |
| GLOUCESTER COUNTY IMPROVEMENT AUTHORITY, et al., | |
| Defendants. | |

**APPEARANCES:**

THE O'HANLON LAW FIRM
By:  Stephen T. O'Hanlon, Esq.
2 Penn Center Plaza Suite 1850
1500 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19102
         Counsel for Plaintiffs

BROWN & CONNERY, LLP
By:  Christine P. O'Hearn, Esq.
     Benjamin S. Teris, Esq.
     Kathleen E. Dohn, Esq.
360 Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108
         Counsel for Defendants


**BUMB**, UNITED STATES DISTRICT JUDGE:

Plaintiffs Marcella Johnson, Betty Davis, Glenna Nichols, and

Swardella Clark, all African American employees, two of whom are

current, and two of whom are former employees of Defendant

Gloucester County Improvement Authority, bring this suit alleging that they were subjected to disparate negative treatment because of their race, and that they suffered retaliation when they complained about the disparate treatment.

Before the Court is Defendants' Partial Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, the motion will be granted in part and denied in part.

## I. FACTS

Defendant Gloucester County Improvement Authority allegedly operates Defendant Shady Lane Nursing Home. (Second Amended Complaint, "SAC", ¶¶ 7-8) Plaintiffs Davis and Nichols presently work at Shady Lane. (SAC ¶¶ 19, 44, 20) Plaintiff Johnson worked at Shady Lane until she was terminated on April 3, 2017. (SAC ¶ 34) Plaintiff Clark worked at Shady Lane until "April, 2017" when she alleges she was "forced to resign." (SAC ¶ 96) All four plaintiffs allege that they experienced continuous and pervasive discriminatory employment practices and a hostile work environment based on race, as well as retaliation, during their employment. Allegedly, the individual Defendants, Carmen Treffiletti, Shery Faulkner, Michelle Baylor, George Strachan, Sal Rocabaldi, Joe D'Angelo, Anthony Pepe, Megan Kerr, and Beth Higgins-- all allegedly supervisors at Shady Lane (SAC ¶¶ 9-17)-- individually acted in a discriminatory and retaliatory manner, and also allegedly conspired with each other to discriminate and retaliate against each Plaintiff. Each Plaintiff's

2

specific factual allegations are set forth next in the order in
which those allegations appear in the Second Amended Complaint.

## A. __Plaintiff Johnson__

"Plaintiff Johnson started working at Defendant Shady Lane on
August 4, 1999 initially as an environmental service / housekeeping
employee." (SAC ¶ 18)

At some unspecified time "in 2011" "Plaintiff Johnson
complained to the NAACP" about "all of the racist things that were
going on at Defendant Shady Lane" including alleged "differential
treatment" of African-American employees, and Caucasian employees
allegedly using racial slurs. (SAC ¶ 22) In connection with that
complaint, at some unspecified time, the president of the Gloucester
County NAACP "met with" Defendant Strachan, the "head of EEO for
Gloucester County" and Shady Lane's lawyer, and also "talked to"
Plaintiffs Johnson and Davis. (SAC ¶ 23)

"[B]y April 2, 2012, Plaintiff Johnson was laid off." (SAC ¶
24) She alleges she was laid off "in retaliation for" her NAACP
complaint. (Id.)

On July 27, 2012, Johnson returned to work at Shady Lane at "a
lower paid position." (SAC ¶ 25) After returning, Johnson alleges
that she "was continually and pretextually written up for everything
that Caucasian supervisors could get Plaintiff Johnson for." (SAC ¶
26) Specifically, Defendants Baylor, Treffiletti, and Pepe
allegedly required Johnson to provide a "doctor's note" when she

"called out sick." (SAC ¶¶ 26-27) Then, allegedly, on September 5, 2013, "Defendants Baylor and Treffiletti called the doctor's office to see what kind of doctor he was." (SAC ¶ 27)

Johnson was "terminated" on September 27, 2013, but then she "won an arbitration and got her job back and she returned to work on January 15, 2015." (SAC ¶ 27) Upon Johnson's return, allegedly Defendant Pepe "told Plaintiff Johnson that he was instructed to adversely treat Plaintiff Johnson and to pretextually terminate her by Defendants Baylor and Treffiletti." (SAC ¶ 29)

Johnson alleges that she continued to be "pretextually punished," "including Defendant Rocabaldi sending someone to Plaintiff Johnson's grandmother's funeral to see if Plaintiff Johnson was present." (SAC ¶ 28) Johnson also alleges that Defendants Treffiletti, Kerr and Rocobaldi "would also write up Plaintiff Johnson for no reason in stark contrast to Caucasian employees." (Id.)

In May, 2016 "Defendants GCIA, Shady Lane, Treffiletti, and Strachan" allegedly falsely accused Johnson of calling a coworker "Uncle Tom." (SAC ¶ 31)

On March 28, 2017 Defendant Pepe allegedly "called [Johnson] to a meeting" "purportedly because Plaintiff Johnson had made statements that a certain nurse was only hired because she was Caucasian." (SAC ¶ 32) Johnson denies having made any such statement. (Id.)

Allegedly, two days later, Defendants Pepe and Baylor informed Johnson that she "would be placed on paid leave." (SAC ¶ 33)

"On April 3, 2017, Plaintiff was terminated in a meeting with Defendants Pepe and Baylor." (SAC ¶ 34)

## B. <u>Plaintiff Davis</u>

"Plaintiff Davis began working at Defendant Shady Lane on October 13, 1988 as a certified nurse's aid." (SAC ¶ 19)

"Around May 30, 2010" Defendant Faulkner allegedly "falsely accused" Davis of "injuring a patient" and imposed "adverse discipline" as a result. (SAC ¶ 36-37)

Allegedly, "[b]etween 2011 and 2015, Plaintiff Davis was intimidated by Defendants Faulkner, Baylor, Treffiletti, and Higgins, who attempted to force Plaintiff Davis to retire when Plaintiff Davis injured herself at work. . . . Caucasian workers were never adversely treated like this when injured at work." (SAC ¶ 38)

The Second Amended Complaint does not allege that Davis was ever laid off or terminated, however, the Court infers that she was because the Second Amended Complaint alleges, without further explanation or context, "Plaintiff Davis did eventually get her job back with back pay on October 13, 2011." (SAC ¶ 39)

Then, allegedly in January, 2015, Davis slipped on ice and injured herself at work, which appears to have temporarily interfered with her ability to perform certain physical tasks at

work.  (SAC ¶ 40)  Defendant Faulkner allegedly "did nothing" when Davis "inform[ed]" him about her severe pain in the days immediately following her fall.  (Id.)

On July 20, 2015, Davis was allegedly medically cleared "to return to work on full duty."  (SAC ¶ 41)  Davis alleges that upon returning to full duty, Defendant Treffiletti "cut Plaintiff Davis' pay by $3 per hour" and that "Caucasian workers were never similarly treated."  (SAC ¶ 41)

Lastly, the Second Amended Complaint alleges: "[o]n January 30, 2017 and in direct retaliation for meritorious racial discrimination complaints and the present lawsuit, Plaintiff Davis was disciplined by Defendant Pepe because Plaintiff Davis used the word 'the' to Robin Atkinson.  Defendant Pepe said this was a threat and complaints to Defendant Treffiletti regarding racial motivation by Defendant Pepe were ignored."  (SAC ¶ 43)

### C. **Plaintiff Nichols**

"Plaintiff Nichols started working at Defendant Shady Lane on November 7, 2005 initially as a certified nurse's aid."  (SAC ¶ 20)

Beginning in 2005, allegedly Defendant Faulkner would "write up" Nichols for using her sick time and for reporting to work late.  (SAC ¶ 46-47)  Allegedly, Caucasian employees' use of sick time was not punished and their tardiness was excused.  (SAC ¶ 47)

In 2007, Nichols allegedly experienced many incidents of verbal harassment and "bullying" by her co-workers and Defendant Strachan.

(SAC ¶ 48-49; see also SAC ¶¶ 57-59, 68)  Some of those incidents
Defendant Faulkner allegedly witnessed and failed to correct; on
another occasion Nichols allegedly complained to "David Shields of
Defendant GCIA" who instructed Defendant Strachan to "'handle it,'"
thereby allegedly "forc[ing] [Nichols] to meet with Defendant
Strachan alone, the very person that Plaintiff Nichols had
complained about."  (SAC ¶ 12)

Also "continuously from 2007 to the present," rules concerning
the conduct of certified nurse's aids were allegedly strictly
enforced by Defendants Faulkner and Higgins against African American
employees, while the same rule infractions allegedly were "never an
issue when the Caucasian aides did it."  (SAC ¶ 50; see also SAC ¶¶
55, 64)

Allegedly from 2007 through 2012, Nichols "repeatedly and
constantly complain[ed] to Defendant Faulkner that Caucasian nurses
and aids . . . mishandle[d] and verbally and physically abuse[d]
residents[,] . . . but nothing was done and it was just covered up."
(SAC ¶¶ 52-53; see also SAC ¶¶ 56, 61, 70, 72-73)

In September 2009, Defendant Higgins allegedly disparately
enforced rules concerning smoking and cell phone use by employees
which, Nichols alleges, effectively created "segregated smoking
areas based upon race between 2009 and 2012."  (SAC ¶ 63)  During
this time period Nichols alleges that she "frequently complained to

Defendant Higgins about a segregated smoking area that was set up by Defendant Higgins but nothing was done." (SAC ¶ 67)

Allegedly, "[o]n October 28, 2009 . . . Plaintiff Nichols was falsely accused of verbally abusing [a resident] and was suspended for five days pending an investigation. Defendant Strachan believed coworkers' lies." (SAC ¶ 69) Allegedly as a result, Defendant Faulkner imposed "progressive discipline." (Id.)

"[B]etween 2012 and 2017" Defendants Faulkner and Higgins allegedly instructed Caucasian employees to double-check the work of Plaintiffs Nichols and Clark "in hope of exacting discipline." (SAC ¶ 75)

During 2015, two Caucasian employees allegedly "began smacking Plaintiff Nichols on her butt once or twice a month." (SAC ¶ 80) The Second Amended Complaint alleges that on September 29, 2015, Nichols "sent an email complaining to Defendants Baylor and Treffiletti." (SAC ¶ 80) The Second Amended Complaint does not allege what happened after Nichols sent the email.

Allegedly on November 26, 2015 Plaintiff Nichols complained to Defendant Treffiletti about verbal harassment by Caucasian coworkers. (SAC ¶ 81) Defendant Treffiletti allegedly "yelled at Plaintiff Nichols 'all this craziness stops now.'" (Id.)

## D. **Plaintiff Clark**

"Plaintiff Clark began working at Defendant Shady Lane on January 14, 2014 as [a] certified nurse's aid." (SAC ¶ 21)

Throughout 2014 and into February, 2015, Clark was allegedly "summoned to the office," "disciplined" and/or "censured" by Defendants Faulkner and Higgins many times for various rule infractions, whereas Caucasian employees who violated the same rules allegedly were not disciplined. (SAC ¶¶ 84-89, 91-92)

Allegedly, "[i]n April of 2017, Plaintiff Clark was forced to resign because of repeated racism and pretextual discipline and retaliation. Even after Plaintiff Clark's resignation notice, Defendants Faulkner and Baylor cited Plaintiff Clark for insubordination when Plaintiff Clark was falsely accused of not signing a patient shower sheet and these Defendants suspended Plaintiff Clark for five days for false accusations of cumulative discipline." (SAC ¶ 96)

The Second Amended Complaint asserts the following claims: § 1983[1] claims against the individual defendants, as well as Gloucester County Improvement Authority and Shady Lane; § 1981[2] claims against the individual defendants, as well as Gloucester County Improvement Authority and Shady Lane; conspiracy claims against all Defendants;

---

[1] 42 U.S.C. § 1983.

[2] 42 U.S.C. § 1981.

and New Jersey Law Against Discrimination ("LAD")[3] claims against Gloucester County Improvement Authority and Shady Lane.[4]

## II.   MOTION TO DISMISS STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> at 663. "[A]n unadorned, the defendant-unlawfully-harmed me accusation" does not suffice to survive a motion to dismiss. <u>Id.</u> at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)).

In reviewing a plaintiff's allegations, a district should conduct a three-part analysis:

---

[3]  N.J.S.A. 10:5-1 et seq.

[4]  The Court exercises federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

> First, the court must take note of the elements a plaintiff
> must plead to state a claim. Second, the court should
> identify allegations that, because they are no more than
> conclusions, are not entitled to the assumption of truth.
> Third, when there are well-pleaded factual allegations, a
> court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for
> relief.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (internal

citations, quotations, and modifications omitted) (quoting Iqbal,

556 U.S. at 675, 679).

Rule 12(b)(6) requires the district court to "accept as true

all well-pled factual allegations as well as all reasonable

inferences that can be drawn from them, and construe those

allegations in the light most favorable to the plaintiff."

Bistrian, 696 F.3d at 358 n. 1. Only the allegations in the

complaint and "matters of public record, orders, exhibits attached

to the complaint and items appearing in the record of the case" are

taken into consideration. Oshiver v. Levin, Fishbein, Sedran &

Berman, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994) (citing Chester Cty.

Intermediate Unit. v. Pennsylvania Blue Shield, 896 F.2d 808, 812

(3d Cir. 1990)). A court may also "consider an undisputedly

authentic document that a defendant attaches as an exhibit to a

motion to dismiss if the plaintiff's claims are based on the

document." Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,

998 F.2d 1192, 1196 (3d Cir. 1993).

III. ANALYSIS

Defendants' Partial Motion to Dismiss seeks to narrow (rather than entirely eliminate) the claims asserted in the rather expansive-- and in places, disjointed-- Second Amended Complaint. Defendants argue: (A) Plaintiff Johnson's § 1983 and § 1981 claims against Defendants Rocobaldi, D'Angelo and Kerr lack sufficient factual allegations; (B) the conspiracy counts lack sufficient factual allegations; and (C) a portion of each Plaintiff's claims is barred by the applicable statute of limitation. The Court addresses each argument in turn.

A. **Plaintiff Johnson's § 1981 and § 1983 claims against Defendants Rocabaldi, D'Angelo and Kerr**

With regard to claims of disparate treatment race discrimination in violation of § 1981, the Third Circuit has stated, "'[t]he substantive elements of a racial discrimination claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII.'" Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 256–57 (3d Cir. 2017) (quoting Brown v. J. Kaz, Inc., 581 F.3d 175, 181–82 (3d Cir. 2009)). Thus, a § 1981 plaintiff must allege "that her [race] was either a 'motivating' or 'determinative' factor in the adverse employment action against her." Connelly v. Lane Const. Corp., 809 F.3d 780, 789 (3d Cir. 2016).

To state a claim for racial harassment / hostile work environment in violation of § 1981, Johnson must allege: "1) [she] suffered intentional discrimination because of [] her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected [her], 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability[,] meaning the employer is responsible." Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (quoting Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)).

For the purposes of the instant motion, the basic elements of the § 1983 claims of racial discrimination and harassment in employment are substantially the same as the § 1981 elements. See Ugorji v. New Jersey Envtl. Infrastructure Tr., 529 F. App'x 145, 150 (3d Cir. 2013) ("Claims for an equal protection violation based on race and national origin under § 1983, like a disparate treatment claim under Title VII, require a plaintiff to prove intentional discrimination."); Stewart v. Rutgers, The State Univ., 120 F.3d 426, 428 (3d Cir. 1997); compare Third Circuit Model Civil Jury Instructions for Employment Discrimination Claims Under Title VII, with Instructions For Race Discrimination Claims Under 42 U.S.C. § 1981, with Instructions Regarding Section 1983 Employment Claims.[5]

---

[5]  Available at http://www.ca3.uscourts.gov/model-civil-jury-table-contents-and-instructions.

To state a claim for retaliation in violation of § 1981, a plaintiff must plead (1) she engaged in protected activity, (2) her employer took an adverse employment action against her, and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010).

*(1)* *Allegations concerning Defendant Rocabaldi*

Defendants argue that the Second Amended Complaint contains insufficient specific factual allegations concerning Defendant Rocabaldi's alleged discriminatory and retaliatory actions against Johnson. In response, Plaintiff points to the following paragraphs of the Second Amended Complaint:

> 28. Upon return to work in 2013, Plaintiff Johnson was again pretextually punished by Defendants Baylor and D'Angelo and Plaintiff Johnson was labeled as being angry and having a chip on her shoulder by Defendants Treffiletti and Kerr as well as other Defendant supervisors such as Defendant Rocabaldi. This type of treatment had occurred from previously from July of 2012 until September of 2013 and subsequent retaliatory incidents included Defendant Rocabaldi sending someone to Plaintiff Johnson's grandmother's funeral to see if Plaintiff Johnson was present. These Defendants would also write up Plaintiff Johnson for no reason in stark contrast to Caucasian employees.

> . . .

> 138. Defendant Rocabaldi was a Supervisor of Environmental Services from approximately 2010 until 2012.

> 139. Defendant Rocabaldi has engaged in direct discrimination based upon race against Plaintiff Johnson.

140. Defendant Rocabaldi has pretextually punished Plaintiff Johnson for no reason and when similarly placed Caucasian employees are not punished for the same activities.

141. Defendant Rocabaldi has failed to act despite meritorious complaints that have been brought to Defendant Rocabaldi by Plaintiff Johnson.

142. Defendant Rocabaldi has engaged in a continuing violation of Plaintiff Johnson's Equal Protection rights since at least 2010.

143. Defendant Rocabaldi has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiff Johnson's Equal Protection Clause rights. In particular, Defendant Rocabaldi conspired with Defendants Baylor, D'Angelo, and Treffiletti to retaliate against Plaintiff Johnson upon her return to work in 2013 and Defendant Rocabaldi conspired with these Defendants to pretextually investigate Plaintiff Johnson, including Defendant Rocabaldi sending someone to Plaintiff Johnson's grandmother's funeral to see if Plaintiff Johnson was there.

144. It does not matter if Defendant Rocabaldi left the conspiracy because he left Defendant Shady Lane. The conspiracy constitutes a continuing violation because the same or similar racist conduct occurs to Plaintiff Johnson and Defendant Rocabaldi's involvement in the conspiracy allowed the conspiracy to foment and continue.

145. These actions include, but are not limited to, Defendant Rocabaldi stating that Plaintiff Johnson was angry and had a chip on her shoulder and baseless write ups of Plaintiff Johnson as well as allegations that Plaintiff Johnson was a liar.


In reply, Defendants argue that the Second Amended Complaint "merely lumps all of the defendants together and accuses every defendant of committing the same harm," which, Defendants contend,

is insufficient under <u>Iqbal</u> and <u>Twombly</u>. (Reply Brief, Dkt. No. 28, p. 2)

Defendants cannot be faulted for attacking the clarity and cohesiveness of the Second Amended Complaint. Much of the pleading appears to be a "kitchen-sink" approach.[6] However, laboring through the conclusory, vague and imprecise statements which pervade the Second Amended Complaint, the Court holds that the facts alleged adequately support, as this early pleading stage of the case, some of Johnson's claims against Defendant Rocabaldi.

<u>Discrimination</u>

With regard to Johnson's discrimination claims, she alleges that Rocabaldi "would write up Plaintiff Johnson for no reason in

_____

[6] <u>Compare</u> Wright, Miller, Kane et al., 5 Fed. Prac. & Proc. Civ. § 1217 (3d ed. 2017) ("Taken together, [Federal] Rules [of Civil Procedure] 8(a) and 8(e)(1) underscore the emphasis placed on clarity and brevity by the federal pleading rules."); <u>see</u> <u>generally</u>, <u>OFI Asset Mgmt. v. Cooper Tire & Rubber</u>, 834 F.3d 481, 492 (3d Cir. 2016) ("[Plaintiff's] kitchen-sink pleading has been a hindrance at every stage of these proceedings."); <u>Greene v. Virgin Islands Water & Power Auth.</u>, 557 F. App'x 189, 191 (3d Cir. 2014)("The operative pleading, the Third Amended Complaint, was filed in March of 2009. Its clarity was undermined by a kitchen-sink approach."); <u>Washington v. Grace</u>, 445 F. App'x 611, 615 (3d Cir. 2011) ("The complaint's defects are many, its clarity undermined by [Plaintiff's] kitchen-sink approach. Several paragraphs discuss events occurring before the two-year statute of limitations cutoff applied to § 1983 claims[.]"); <u>Tilbury v. Aames Home Loan</u>, 199 F. App'x 122, 124 (3d Cir. 2006)("the District Court was not exaggerating when it remarked that the [Plaintiffs'] complaint 'is an example of an everything but the kitchen sink pleading in which they sue almost everyone under the sun.'"); <u>see</u> <u>also</u>, <u>Mary Ann Pensiero, Inc. v. Lingle</u>, 847 F.2d 90, 97 (3d Cir. 1988)("the practice of 'throwing in the kitchen sink' at times may be so abusive as to merit Rule 11 condemnation.").

stark contrast to Caucasian employees." (SAC ¶ 28)  This single

sentence is too vague and ambiguous to support a discrimination

claim because it does not adequately plead differential treatment

supporting a plausible conclusion of racial bias.  The Second

Amended Complaint does not explain how Caucasian employees were

treated differently than Plaintiffs.  Indeed, one reasonable

interpretation of the sentence is that Plaintiffs were written up

"for no reason" while Caucasian employees were written up with

reason.

Accordingly, the Court holds that Plaintiff Johnson has failed

to state a claim for discrimination against Defendant Rocabaldi.

Hostile Work Environment

In contrast, the Court holds that Johnson's harassment claims

survive the instant motion.  Without elaboration, Defendants argue

that the allegation concerning Rocabaldi's "single act" (Reply

Brief, Dkt. No. 28, p. 2) of "pretextually investigat[ing]" Johnson

(SAC ¶ 143) by "sending someone to Plaintiff Johnson's grandmother's

funeral to see if Plaintiff Johnson was present" (SAC ¶¶ 28, 143)

"does not rise to the level necessary to assert a Section 1983 or

Section 1981 claim."  (Reply Brief, Dkt. No. 28, p. 2)  The Court

disagrees.

The standard is "severe or pervasive."  Castleberry, 863 F.3d

at 264 (emphasis in original).  Thus, a single incident, if

sufficiently severe, can support a hostile work environment claim.

Id. ("Under the correct 'severe or pervasive' standard, the parties dispute whether the supervisor's single use of the 'n-word' is adequately 'severe' and if one isolated incident is sufficient to state a claim under that standard. Although the resolution of that question is context-specific, it is clear that one such instance can suffice to state a claim.").

Applying this standard, the Court holds that the allegations concerning Rocabaldi's verifying Johnson's attendance at a close family member's funeral constitute a sufficiently severe invasion of Johnson's privacy to allow Johnson's hostile work environment claim to proceed to discovery. Moreover, the allegations concerning Rocabaldi's differential treatment of African American employees and Caucasian employees with regard to discipline, while more attenuated to the harassment claim, nonetheless raises above the speculative level Johnson's claim that the severe harassment was racially motivated.

Retaliation

In addition to the theories discussed above, Johnson appears to assert that Defendant Rocabaldi's alleged discrimination and creation of a hostile work environment were in retaliation for Johnson's complaint to the NAACP in 2011. Johnson has alleged protected activity-- i.e., the NAACP complaint, and adverse employment actions based on the facts supporting the discrimination and hostile work environment claims discussed above. While the

lengthy lapse of time between the protected activity and the alleged adverse actions substantially weakens any inference of causation, such issues are better addressed at summary judgment. Cf. LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

Accordingly, Defendants' Partial Motion to Dismiss Johnson's § 1981 and § 1983 claims against Defendant Rocabaldi will be granted as to the discrimination claims and denied in all other respects.[7]

(2)  *Allegations concerning Defendant D'Angelo*

Defendants level the same attack on the allegations against Defendant D'Angelo, asserting that they are vague, conclusory and not specific to D'Angelo.  The factual allegations concerning D'Angelo are:

> 22. In 2011, Plaintiff Johnson complained to the NAACP about Defendant Shady Lane because of all the racist things that were going on at Defendant Shady Lane including differential treatment based upon race in disciplinary contexts perpetuated by among others Defendant Strachan, withholding of Plaintiff Johnson's increased pay by Defendant Strachan despite Plaintiff Johnson being given a purported promotion requiring a union grievance, more exacting scrutiny of licensing upkeep for African-American employees as compared to Caucasian employees, a Caucasian nurse named Vicky Smith calling an African-American

---

[7]  This holding is subject to the Court's independent holding regarding the timeliness of Plaintiff Johnson's claims as set forth below.

certified nurse's assistant Aunt Jemima, and Defendant
D'Angelo calling a student worker named Jamal a Nigger.

. . .

28. Upon return to work in 2013, Plaintiff Johnson was
again pretextually punished by Defendants Baylor and
D'Angelo and Plaintiff Johnson was labeled as being angry
and having a chip on her shoulder by Defendants Treffiletti
and Kerr as well as other Defendant supervisors such as
Defendant Rocabaldi. This type of treatment had occurred
from previously from July of 2012 until September of 2013
and subsequent retaliatory incidents included Defendant
Rocabaldi sending someone to Plaintiff Johnson's
grandmother's funeral to see if Plaintiff Johnson was
present. These Defendants would also write up Plaintiff
Johnson for no reason in stark contrast to Caucasian
employees.

. . .

143. Defendant Rocabaldi has engaged in an ongoing and
continuing conspiracy with all other Defendants to violate
all Plaintiff Johnson's Equal Protection Clause rights. In
particular, Defendant Rocabaldi conspired with Defendants
Baylor, D'Angelo, and Treffiletti to retaliate against
Plaintiff Johnson upon her return to work in 2013 and
Defendant Rocabaldi conspired with these Defendants to
pretextually investigate Plaintiff Johnson, including
Defendant Rocabaldi sending someone to Plaintiff Johnson's
grandmother's funeral to see if Plaintiff Johnson was
there.

. . .

148. Defendant D'Angelo is Head of Maintenance and
Environmental Management and has been in that or a similar
position since approximately 2002.

149. Defendant D'Angelo has engaged in direct
discrimination based upon race against Plaintiff Johnson.

150. Defendant D'Angelo has pretextually punished
Plaintiff Johnson for no reason and when similarly placed
Caucasian employees are not punished for the same
activities.

151. Defendant D'Angelo has failed to act despite meritorious complaints that have been brought to Defendant D'Angelo by Plaintiff Johnson.

152. Defendant D'Angelo has engaged in a continuing violation of Plaintiff Johnson's Equal Protection rights since at least 2010.

153. Defendant D'Angelo has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiff Johnson's Equal Protection Clause rights.

154. These actions include, but are not limited to, Defendant D'Angelo retaliating against Plaintiff Johnson and writing her up upon her return to work in 2013. Plaintiff Johnson had previously complained about Defendant D'Angelo calling a coworker a Nigger.

(SAC ¶ 22, 28, 143, 148-54)

Discrimination

Johnson's discrimination claim against D'Angelo is based on the same faulty sentence in paragraph 28 of the Second Amended Complaint discussed above with regard to Johnson's claim against Defendant Rocabaldi. Accordingly, for the reasons already articulated, Johnson's discrimination claim against Defendant D'Angelo fails.

Hostile Work Environment

The Court holds that Johnson has not alleged sufficient facts to support a hostile work environment claim against Defendant D'Angelo. Unlike Johnson's claim against Defendant Rocabaldi, the allegations concerning Defendant D'Angelo's actions do not rise to the level of a single severe incident. The Second Amended Complaint merely alleges that Defendant D'Angelo "wrote up" Johnson.

Moreover, to the extent that the Second Amended Complaint may allege that Defendant D'Angelo wrote up Johnson more than once, the Second Amended Complaint lacks sufficient factual allegations, which if accepted as true, would establish that the write ups formed a pattern of conduct.

Retaliation

With regard to retaliation, the Second Amended Complaint alleges that D'Angelo wrote up Johnson in 2013 allegedly in retaliation for her complaint to the NAACP. For the reasons explained as to Johnson's similar claim against Defendant Rocabaldi, the Court holds that these allegations are sufficient at this early stage of the case.[8]

Accordingly, Defendants' Partial Motion to Dismiss Johnson's § 1981 and § 1983 claims against Defendant D'Angelo will be granted as to the discrimination and hostile work environment claims but denied as to the retaliation claim.[9]

(3) *Allegations concerning Defendant Kerr*

_____

[8] It is not clear whether Johnson also asserts a retaliation claim based on the single sentence in Paragraph 154 which reads: "Plaintiff Johnson had previously complained about Defendant D'Angelo calling a coworker a [racial epithet]." This single sentence cannot support a separate retaliation claim. It does not allege to whom Johnson allegedly complained. Nor does it allege any facts or circumstances under which it may be plausibly inferred that Defendant D'Angelo knew about Johnson's alleged complaint.

[9] This holding is subject to the Court's independent holding regarding the timeliness of Plaintiff Johnson's claims as set forth below.

Lastly, Johnson's factual allegations concerning Defendant Kerr are:

16.    Defendant Megan Kerr (hereinafter "Defendant Kerr") was a former HR Director and former supervisor and employee at Shady Lane Nursing Home.

.  .  .

28.    Upon return to work in 2013, . . . Plaintiff Johnson was labeled as being angry and having a chip on her shoulder by Defendants Treffiletti and Kerr as well as other Defendant supervisors such as Defendant Rocabaldi. This type of treatment had occurred from previously from July of 2012 until September of 2013 and subsequent retaliatory incidents included Defendant Rocabaldi sending someone to Plaintiff Johnson's grandmother's funeral to see if Plaintiff Johnson was present.  These Defendants would also write up Plaintiff Johnson for no reason in stark contrast to Caucasian employees.

.  .  .

56.    Plaintiff Nichols began giving Defendant Faulkner handwritten statements about resident abuse and neglect but nothing was done.  At one point, Plaintiff Nichols went to Defendant GCIA to report Defendant Faulkner to Defendant Kerr who at the time was HR manager.  Defendant Kerr was informed of everything that was going on with regard to differential treatment of African-American staff at Defendant Shady Lane.  Nothing was done and nothing was done to Defendant Faulkner.
.  .  .

.  .  .

166.  Defendant Kerr was HR Director from approximately 2009 until 2015.

167.   Defendant Kerr has engaged in direct discrimination based upon race against Plaintiff Johnson.

168.   Defendant Kerr has pretextually punished Plaintiff Johnson for no reason and when similarly placed Caucasian employees are not punished for the same activities.

169. Defendant Kerr has failed to act despite meritorious complaints that have been brought to Defendant Kerr by Plaintiff Johnson.

170. Defendant Kerr has engaged in a continuing violation of Plaintiff Johnson's Equal Protection rights since at least 2009.

171. Defendant Kerr has engaged in an ongoing and continuing conspiracy with all other Defendants to violate all Plaintiff Johnson's Equal Protection Clause rights. In particular, Defendant Kerr conspired with Defendants Baylor, D'Angelo, and Treffiletti to retaliate against Plaintiff Johnson upon her return to work in 2013 and Defendant Kerr conspired with these Defendants to falsely and repeatedly label Plaintiff Johnson as angry with a chip on her shoulder and Defendant Kerr oversaw Plaintiff Johnson's return to work at a lower rate of pay than when she was terminated in violation of the CBA and in retaliation for complaints to Defendant Kerr about racial discrimination which were not acted upon by Defendant Kerr despite her having the power to do so.

172. It does not matter if Defendant Kerr left the conspiracy because he left Defendant Shady Lane. The conspiracy constitutes a continuing violation because the same or similar racist conduct occurs to Plaintiff Johnson and Defendant Kerr's involvement in the conspiracy allowed the conspiracy to foment and continue.

173. These actions include, but are not limited to, Defendant Kerr stating that Plaintiff Johnson was angry and had a chip on her shoulder and baseless write ups of Plaintiff Johnson.

## Discrimination

Like the claims against Defendants Rocabaldi and D'Angelo, Johnson asserts that in 2013 Defendant Kerr "wr[o]te up Plaintiff Johnson for no reason in stark contrast to Caucasian employees." (SAC ¶ 28) For the reasons already articulated, this factual allegation is insufficient to support Johnson's race discrimination claims.

Additionally, Johnson alleges a discrimination claim against Defendant Kerr under a knowledge and acquiescence theory. Plaintiffs' counsel explains in Johnson's opposition brief, "Defendant Kerr was HR Director at relevant times and 'was informed of everything that was going on with regard to differential treatment of African-American staff at Defendant Shady Lane. Nothing was done[.]'" (Opposition Brief, Dkt. No. 26, p. 9, quoting SAC ¶ 56) This allegation is also too vague and conclusory to support a discrimination claim. Johnson alleges no facts indicating how Defendant Kerr came to be "informed" about the alleged unspecified differential treatment unspecified African American employees allegedly experienced.

<u>Hostile Work Environment</u>

The Court holds that Johnson has not alleged sufficient facts to support a hostile work environment claim against Defendant Kerr for essentially the same reasons Johnson has not stated a claim against Defendant D'Angelo. Like the claim against Defendant D'Angelo, Johnson merely alleges that Defendant Kerr "wrote her up," perhaps more than once.

The additional fact that Defendant Kerr allegedly "stat[ed] that Plaintiff Johnson was angry and had a chip on her shoulder," (SAC ¶ 173), does not independently, nor in combination with the alleged baseless write up (or write ups), establish a hostile work environment claim. The allegation is not sufficiently severe to

support a single incident theory, nor are there any facts alleged that would plausibly support a conclusion that Defendant Kerr's actions were pervasive. Moreover, the allegation is impermissibly vague as it does not identify to whom, or under what circumstances, Defendant Kerr allegedly said that Plaintiff Johnson had a chip on her shoulder.

Retaliation

Johnson's retaliation claim against Defendant Kerr is identical to the retaliation claims against Defendant Rocabaldi and D'Angelo. Johnson's retaliation claim against Defendant Kerr survives the instant Partial Motion to Dismiss for the same reasons articulated above.

Accordingly, Defendants' Partial Motion to Dismiss Johnson's § 1981 and § 1983 claims against Defendant Kerr will be granted as to the discrimination claims and hostile work environment claims but denied as to the retaliation claim.[10]

B. **The Conspiracy Counts**

(1) *Intra-Corporate Conspiracy Doctrine*

Plaintiffs concede that the intra-corporate doctrine bars the conspiracy claims against the entity defendants, Gloucester County Improvement Authority and Shady Lane. (Opposition Brief, Dkt. No.

---

[10] This holding is subject to the Court's independent holding regarding the timeliness of Plaintiff Johnson's claims as set forth below.

26, p. 4, 13, 17)  Accordingly, the Motion to Dismiss will be granted as to the conspiracy claims against those two Defendants.

*(2)* *Sufficiency of the Factual Allegations of Conspiracy*

Defendants assert that the Second Amended Complaint fails to plead sufficient facts to support a conspiracy claim against any of the individual defendants.  In particular, Defendants assert that "the [Second Amended] Complaint lacks any allegation of a meeting of the minds amongst Defendants to violate Plaintiffs' civil rights." (Moving Brief, Dkt. No. 24, p. 19)

In opposition, Plaintiffs point to numerous paragraphs of the Second Amended Complaint where various Defendants are alleged to have "work[ed] together" or "act[ed] together." (Opposition Brief, Dkt. No. 26, p. 11)  These allegations, however, are insufficient as a matter of law.

The Third Circuit has expressly set forth the pleading standard for § 1983 conspiracies: "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred. . . . Twombly and Iqbal . . . require 'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.'"  Great Western Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 178 (3d Cir. 2010)(quoting Twombly).[11]

_____

    [11]  The Court's analysis concerning the sufficiency of the conspiracy allegations applies to all conspiracies alleged in the

<u>Great Western</u> holds that merely pleading "'concerted action,'"
and then asserting that such action is "'not likely to occur in the
absence of agreement,'" is legally insufficient.  615 F.3d at 178
(quoting plaintiffs' proposed amended complaint); <u>see also</u>, <u>Figueroa</u>
<u>v. City of Camden</u>, 580 F. Supp. 2d 390, 402 (D.N.J. 2008)("to make
out a § 1983 conspiracy claim, the plaintiff must make specific
factual allegations of a combination, agreement or understanding
amongst all or between any of defendants to plot, plan, or conspire
to carry out the alleged chain of events in order to deprive
plaintiff of a federally protected right.").  The conspiracy
allegations in Plaintiffs' Second Amended Complaint are closely
analogous to those at issue in <u>Great Northern</u>.  The Second Amended
Complaint merely alleges parallel action which is insufficient to
support a plausible inference of a meeting of the minds.  <u>Great</u>
<u>Northern</u>, 615 F.3d at 176-77 ("'Without more, parallel conduct does
not suggest conspiracy[.] . . . [W]hen allegations of parallel
conduct are set out . . . they must be placed in a context that
raises a suggestion of a preceding agreement, not merely parallel
conduct that could just as well be independent action.'")(quoting
<u>Twombly</u>, 550 U.S. at 556-57).

---

Second Amended Complaint.  While <u>Great Northern</u> only addressed §
1983 conspiracies, the Court finds no distinguishing reason to apply
a different pleading standard to Plaintiffs' claims of conspiracy to
violate § 1981.  The Second Amended Complaint does not allege a
conspiracy to violate the LAD.

Plaintiffs argue that they do allege more: the Second Amended Complaint alleges that "Sylvia Murphy . . . will testify to an explicit conspiracy by [] Defendants [Faulkner and Strachan] to target African-American employees and enforce disparate discipline." (SAC ¶ 60)  This allegation, however, is merely conclusory; it contains no facts concerning what Sylvia Murphy allegedly saw, heard, read, experienced or otherwise obtained personal knowledge of.  Plaintiffs cannot sustain their burden of pleading facts by stating that such facts will be provided in witness testimony at a later time. (See Opposition Brief, Dkt. No. 26, p. 12, "Ms. Murphy will testify in discovery and at trial.")  The time is now-- not in discovery, and the place is in the pleading-- not in a deposition transcript.

The Second Amended Complaint lacks factual averments which would "create plausible grounds to infer an agreement" between any of the individual Defendants.  Great Northern, 615 F.3d at 179. Accordingly, Defendants' Motion to Dismiss the conspiracy claims will be granted.

**C.** **Statutes of Limitation**

The parties do not dispute that the limitation period for § 1983 claims and LAD claims is two years;[12] and the limitation period

---

[12] O'Connor v. City of Newark, 440 F.3d 125, 126-27 (3d Cir. 2006)(two-year statute of limitation for § 1983 claims in New Jersey); Montells v. Haynes, 133 N.J. 282, 292 (1993)(holding that

for § 1981 claims is four years.[13]  Thus, Defendants argue, the accrual dates for the claims are November 10, 2014 (§ 1983 and LAD); and November 10, 2012 (§ 1981), and any claims based on alleged adverse employment actions taking place prior to those dates are time-barred.

In opposition, Plaintiffs assert that all of their claims are "timely pursuant to continuing violation doctrine and hostile work environment theory." (sic) (Opposition Brief, Dkt. No. 26, p. 13)

*(1)  Continuing Violation Theory*

The continuing violation doctrine does not apply to discrete adverse employment actions such as termination (or other separation from employment such as lay-offs, reductions in force, or constructive termination), and wrongful discipline.  See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002) (explaining that "discrete acts" are easy to identify as discriminatory, such as termination, failure to promote, denial of transfer, or refusal to hire).  This rule applies to each of Plaintiffs' claims as follows.

Plaintiff Johnson

_____

the two-year statute of limitation for personal injury claims applies to LAD claims).

[13]  Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 371 (2004)(holding that the "catchall 4-year statute of limitations for actions arising under federal statutes", as opposed to the state law applies to claims arising under § 1981).

Johnson alleges the following adverse employment actions. She was allegedly: (a) laid off "by April 2, 2012," (SAC ¶ 24); (b) written-up in July or August of 2012 (SAC ¶ 25); (c) written-up and "pretextually punished" several times between July of 2012 and September 27, 2013 (SAC ¶¶ 26-28); (d) terminated on September 27, 2013 (SAC ¶ 27); (e) "pretextually punished" in 2015 (SAC ¶ 28); (f) "placed on [disciplinary] paid leave" on March 30, 2017 (SAC ¶ 33); (g) sent home for disciplinary reasons sometime after November 16, 2016 (SAC ¶ 100); and (h) terminated on April 3, 2017 (SAC ¶ 34).

Each of these alleged adverse employment actions are discrete events to which the continuing violation doctrine does not apply. Accordingly, the Court holds that Johnson's § 1983 and LAD claims are time-barred to the extent they are based on (a) through (d) and Johnson's § 1981 claims are time-barred to the extent they are based on (a) through (b) and part of (c).

Plaintiff Davis

Davis alleges the following adverse employment actions. She was allegedly: (a) "told not to report to work" for disciplinary reasons "around May 30, 2010" (SAC ¶ 36); (b) subjected to "adverse discipline and had to fight to retain her job in 2010" (SAC ¶ 37); (c) terminated sometime prior to October 13, 2011 (SAC ¶ 39); (d) not accommodated for her work injury and resulting pain sometime between January 19, 2015 and July 20, 2015 (SAC ¶ 40); (e) demoted with a decrease in pay on or after July 20, 2015 (SAC ¶ 41); (f)

disciplined on January 30, 2017 (SAC ¶ 43); and (g) sent home for disciplinary reasons sometime after November 16, 2016 (SAC ¶ 100).

Each of these alleged adverse employment actions are discrete events to which the continuing violation doctrine does not apply. Accordingly, the Court holds that Davis' § 1983 and LAD claims are time-barred to the extent they are based on (a) through (c); and Davis' § 1981 claims are time-barred to the extent they are based on (a) through (c).

Plaintiff Nichols

Nichols alleges the following adverse employment actions. She was allegedly: (a) written up in 2005 (SAC ¶ 46); (b) written up sometime between 2005 and 2007 (SAC ¶ 47); (c) "sent home" and suspended for disciplinary reasons in September 2009 (SAC ¶ 64); (d) suspended for five days for disciplinary reasons on October 28, 2009 (SAC ¶ 69); (e) "interrogated and accused of being a racist by a labor law attorney hired by Defendant GCIA" on April 13, 2016 (SAC ¶ 82); (f) "interrogated by Defendants Treffiletti and Baylor about private texts and emails sent from Plaintiff Nichols' telephone" on April 14, 2016 (SAC ¶ 83); and (g) sent home for disciplinary reasons sometime after November 16, 2016 (SAC ¶ 100).

Each of these alleged adverse employment actions are discrete events to which the continuing violation doctrine does not apply. Accordingly, the Court holds that Nichols' § 1983 and LAD claims are time-barred to the extent they are based on (a) through (d); and

Nichols' § 1981 claims are time-barred to the extent they are based on (a) through (d).

<u>Plaintiff Clark</u>

Clark alleges the following adverse employment actions. She was allegedly: (a) disciplined in January of 2014 (SAC ¶ 84); (b) disciplined in February 2014 (SAC ¶ 85); (c) "censured" or disciplined in March of 2014 (SAC ¶ 86); (d) disciplined in April 2014 (SAC ¶ 87); (e) "censured" in May 2014 (SAC ¶ 88); (f) written up in February of 2017; and (g) sent home for disciplinary reasons sometime after November 16, 2016. (SAC ¶ 100)

Each of these alleged adverse employment actions are discrete events to which the continuing violation doctrine does not apply. Accordingly, the Court holds that Clark's § 1983 and LAD claims are time-barred to the extent they are based on (a) through (d). Clark's § 1981 claims based on these alleged adverse employment actions are not time-barred.

*(2)   Hostile Work Environment*

Discrimination and retaliation claims based on a pervasive hostile work environment theory accrue on the date of the last discrete act in a series of occurrences that allegedly constitute the hostile work environment.  <u>See</u> <u>Morgan</u>, 536 U.S. at 117 (explaining that a continuing violation is a series of separate acts that collectively constitute one unlawful employment practice, and

that "[s]uch a cause of action accrues on the date on which the last component act occurred").

Discrimination and retaliation claims based on a single incident hostile work environment theory obviously accrue on the date the single incident occurred.

These rules apply to each of Plaintiffs' claims as follows.

Plaintiff Johnson

As discussed above, Johnson has stated a hostile work environment claim based on the single incident of Defendant Rocabaldi allegedly verifying Johnson's attendance at her grandmother's funeral. This incident allegedly occurred in 2015. (SAC ¶ 28) Accordingly, Johnson's § 1983, LAD, and § 1981 claims, to the extent they are based on this incident, are timely.

Plaintiff Davis

With respect to Plaintiff Davis, the Second Amended Complaint alleges, "[b]etween 2011 and 2015, Plaintiff Davis was intimidated by Defendants Faulkner, Baylor, Treffiletti, and Higgins, who attempted to force Plaintiff Davis to retire when Plaintiff Davis injured herself at work. . . . Caucasian workers were never adversely treated like this when injured at work." (SAC ¶ 38)

The last component act allegedly occurred in 2015; accordingly Davis' § 1983, LAD, and § 1981 claims, to the extent they are based on this incident, are timely.

Plaintiff Nichols

Plaintiff Nichols appears to assert four separate hostile work environment claims. First, she asserts that Defendants Faulkner and Higgins created a hostile work environment by more closely monitoring Nichols' work and more strictly enforcing rule infractions. (SAC ¶¶ 50, 55, 64, 75) These events allegedly occurred "continuously" "from 2007 to the present." (SAC ¶¶ 50, 75) The last component act allegedly occurred in 2017 (the year the Second Amended Complaint was filed); accordingly Davis' § 1983, LAD, and § 1981 claims, to the extent they are based on this first hostile work environment theory, are timely.

Second, Nichols asserts that she was "harassed" and "bullied" by co-workers from 2007 until she was transferred to housekeeping in "March of 2012." (SAC ¶¶ 48, 74, 57-59, 68) She alleges that during this time, Defendant Faulkner knew about the harassment and acquiesced in it. (SAC ¶¶ 48, 57, 58, 68) The last component act allegedly occurred in March of 2012; accordingly Davis' § 1983, LAD, and § 1981 claims, to the extent they are based on this second hostile work environment theory, are all time-barred.

Third, Nichols separately alleges that in 2015 she was "smack[ed] . . . on her butt once or twice a month" by two Caucasian co-workers and that she was also verbally harassed by Caucasian co-workers. (SAC ¶¶ 80-81) Nichols allegedly complained to Defendant Treffiletti, who allegedly did nothing. (SAC ¶ 81) The last component act allegedly occurred in 2015; accordingly Davis' § 1983,

LAD, and § 1981 claims, to the extent they are based on this third hostile work environment theory, are timely.

Fourth, Nichols alleges that Defendant Higgins "set up" "segregated smoking areas based upon race" "from 2009 until 2012." (SAC ¶¶ 63, 67)  The last component act allegedly occurred in 2012; accordingly Davis' § 1983 and LAD claims, to the extent they are based on this fourth hostile work environment theory, are time-barred.  It is not clear at this time whether the § 1981 claim is timely.  If discovery reveals that the last component act occurred prior to November 10th of 2012, the Court may address the issue at summary judgment.

<u>Plaintiff Clark</u>

Plaintiff Clark's hostile work environment claim appears to be based on an alleged pattern of unwarranted discipline and reprimands that occurred almost monthly throughout 2014 and into 2015.  (SAC ¶¶ 84-93)  The last component act allegedly occurred in 2015; accordingly Clark's § 1983, LAD, and § 1981 claims, to the extent they are based on this hostile work environment theory, are timely.

Accordingly, Defendants' Partial Motion to Dismiss each of Plaintiffs' claims based on the applicable statutes of limitation will be granted in part and denied in part, as specifically set forth above.

D. **Leave to Amend**

   Plaintiffs generically assert that, in the event any of their claims are dismissed, they should "be permitted to amend their second amended complaint." (Opposition Brief, Dkt No. 26, p. 5, 17) The Court declines to give Plaintiffs carte blanche permission to make a fourth attempt to re-plead their claims when the original complaint in this case was filed over a year ago. Indeed, at least some of the identified deficiencies of the Second Amended Complaint-- namely the time-barred claims-- likely cannot be cured by amendment.[14]

   Moreover, in response to Defendants' previous pre-motion letters filed pursuant to this Court's Individual Rules and Procedures, and after a pre-motion conference concerning Defendants' proposed Motion to Dismiss, this Court already granted Plaintiffs leave to amend their pleading which resulted in the Second Amended Complaint at issue here.

   In any event, the Court does not construe Plaintiffs' generic request to amend as a formal motion to amend, as such a motion would require the filing of the proposed amended pleading, see L. Civ. R. 7.1(f), which Plaintiffs have not done. Should Plaintiffs file a

_____

[14] The Court makes no ruling at this time as to the separate issue of admissibility of the events alleged to have occurred prior to the expiration of the statutes of limitation. Such events, while not independently actionable, nonetheless may be admissible in support of Plaintiffs' timely claims. See generally, Fed. R. Evid. 404(b)(2). Discovery in this case should be guided accordingly.

proper Motion to Amend, the Court invites both Plaintiffs and

Defendants to thoroughly address why the proposed amendments would

not be futile and/or prejudicial to Defendants.  Additionally,

Plaintiffs' proposed amended pleading shall provide a black-lined

version comparing the Second Amended Complaint with the proposed

Third Amended Complaint.  The Court desires not to have to

independently labor to identify proposed changes to an already dense

pleading which presently includes over 250 numbered paragraphs and

spans 47 pages.  <u>See</u> <u>supra</u>, fn. 6 (re: clarity and brevity of

pleadings).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Partial Motion to

Dismiss will be granted in part and denied in part as specifically

set forth in the accompanying Order issued on this date.


                                    s/ Renée Marie Bumb
Dated: <u>December 21, 2017</u>      _____
                                    RENÉE MARIE BUMB
                                    UNITED STATES DISTRICT JUDGE